## KOVELL v. PORTLAND TUG & BARGE CO.

### The YF 730.

### The YF 618,

### No. 12035.

United States Court of Appeals
Ninth Circuit.

Dec. 29, 1948.

750

L. Charles Gay, of San Francisco, Cal., for appellant.

James A. Quinby, Lloyd M. Tweedt, Stanley J. Cook and Derby, Sharp, Quinby & Tweedt, all of San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, ORR, Circuit Judge, and HARRISON, District Judge.

DENMAN, Chief Judge.

This is an appeal from a decree in an admiralty proceeding in rem, brought by second mate Kovell for himself and other members of the crew of the sea-going diesel tug, M. V. Mundos, against two steel barges for claimed services in the salvage of the barges. The tug and barges were owned by the appellee, their claimant in this proceeding in rem. The district court dismissed the libel after a hearing on the merits.

The tug was towing the two barges in tandem on a voyage from San Diego, California, to Seattle, Washington. On the evening of June 19, 1947, when northwest of the Farallon Islands off San Francisco Bay, they encountered a very heavy northwest windstorm, estimated by the captain at 60 to 65 miles an hour. The storm lasted through the 20th and into the 21st. The testimony that the wind continued at great force with seas "mountainous" in height throughout the period of the claimed salvage services, as recited in appellant's brief, is not disputed in appellee's brief, nor was it at the hearing.

The barges were each 220 feet in length by 30 feet beam. They were not laden and exposed to the heavy seas their 12 feet of freeboard. There was no structure above their flat decks. A single wire towing pennant connected the tug to the lead barge. Another single wire pennant ran from the lead barge to the second barge.

At a quarter of one in the morning of June 20th, the force of the heavy seas and wind on the 12-foot freeboard of the empty barges, "whipping" each other about, caused the pennant to the lead barge to part. The vessels then were about 15 miles northwest of the Farralons. The barges so wired together began a rapid drift toward the shore of California, where, in the sea prevailing, they probably would have been destroyed—that is, if their pounding against one another in the heavy seas had not opened up the steel hull on one or the other and caused her to sink before reaching the beach surf.

The tug followed the southeast drift of the barges throughout the night, playing its search light on them. The seas were pounding the barges against each other and the hulls of both were damaged, as the heavy pennant sank and drew them together. After daylight, the tug attempted to

go alongside one of the barges, where she twice collided, had most of her fenders torn off and had her bow badly damaged. Unsuccessful thus to put a sailor on the barge, the tug attempted to pass over open water between the barges, with the tug's anchor hanging adrift to engage the pennant between the barges. In this the tug was unsuccessful in finding safe space between the barges.

The tug captain finally decided that the only way to save the barges was to put a man aboard one of them by the tug's lifeboat. That man could either fasten on her another pennant from the tug or, if this was unsuccessful, he could drop the anchor on the barge he boarded, holding her so the other barge could drift behind and leave space for the tug to pass between the two and have the tug's drifting anchor pick up the pennant between the barges.

The tug's captain recognized the danger in launching the lifeboat in such wind and sea and rowing her to one of the barges and lying alongside it while a man attempted to climb aboard. He also recognized the danger of injury or drowning to the man who had the courage to attempt to climb up the 12-foot freeboard of the surging barge, with the risk that the barge might at any time fill and sink from the injury caused by the constant colliding of the other barge.

█ It is obvious that it could not be within the scope of a modern sailor's obligation to his employer to take such a risk of life and limb, whatever may have been the obligations of a sailor a century ago, and that the captain could not order any one to man the lifeboat or board the barge.

Second mate Kovell volunteered to board one of the barges, and first mate Edwards and seamen Kobbe and McAdams manned the lifeboat.

At about 3 o'clock in the afternoon, the tug towed the lifeboat near one of the barges and freed her. Her crew rowed her alongside the barge and after three attempts they managed to get Kovell next her hanging anchor chain. Kovell, his clothing wet from the sea, climbed the chain to reach the barge's smooth deck with no protection from wave or wind,

where he remained for sixteen hours until 7 o'clock the next morning. That the storm continued during this time is apparent. It took the tug of 1380 horsepower, seventeen hours to tow the barges less than 20 miles into outer San Francisco Bay after she was finally able to recapture the barges at 4:15 in the afternoon of the 20th.

The danger to the lifeboat at the barge's side is demonstrated by what happened to her when she returned to the tug. The three men managed to board the tug but the lifeboat, the first mate testified, "hit against one of the remaining [tug's] fenders and tore all to pieces."

With Kovell on the barge it was possible to get a heaving line to him and he passed a wire rope to the tug. The barges were then taken in tow, but after 45 minutes in the continuing high wind and sea the line parted and the barges were again adrift. Next, Kovell let go the anchor on the barge and this caused the pennant between the barges to rise and the tug was able to pick it up by running between the barges, the method which previously had been unsuccessful. The tug and tow proceeded to San Francisco. Kovell remained on the barge all night, and was taken off at 7 o'clock in the morning just outside the Golden Gate Bridge.

On the hearing here it was admitted that the storm's injury to the tug and the barges terminated the voyage to Seattle, and on the evidence we hold that it was terminated by such injuries before Kovell boarded the barge. The voyage so terminated, the barges, towed to San Francisco, there were repaired. The tug was taken to Portland, Oregon, for her repairs.

█ On the question of the liability of appellee to mate Kovell for any salvage service to appellee's two barges, it is not affected by the fact that appellee also owned the tug. 46 U.S.C. § 727, 46 U.S.C.A. § 727, provides, "The right to remuneration for assistance or salvage services shall not be affected by common ownership of the vessels rendering and receiving such assistance or salvage services."

The barge owner is liable to Kovell and his companions in the lifeboat as if ap-

pellee did not own the tug. Jacobson v. Panama R. Co., 2 Cir., 266 F. 344.

As to Kovell, this is (a) for his services with the three others in launching and placing the lifeboat alongside the barge and (b) for his services in boarding the barge and making possible her subsequent salvage from sinking by colliding with the other barge, or destruction, both being already injured, in the surf of the California beach where the wind soon would have taken them.

That Kovell and his companions owed no duty to appellee as owner of the barges to undertake such a dangerous service we have already shown. That the towage duties of the owner and crew of the tug to the tow ceased when her salvage requires such services as here rendered, has long been established in the admiralty law. In England, see The Minnehaha, Lush. 335, 15 Eng.Repr. 444, where the towing hauser having broken without fault of the tug and "if in the discharge of this task, by sudden violence of wind or waves, or other accidents, the ship in tow is placed in danger, and the towing vessel incurs risks and performs duties which were not within the scope of her original engagement, she is entitled to additional remuneration for additional services if the ship be saved, and may claim as a salvor, instead of being restricted to the sum stipulated to be paid for mere towage."

In the United States, see the case of The Connemara, 108 U.S. 352, 2 S.Ct. 754, 27 L.Ed. 751, where the tug extinguished a fire on the tow and the crew of the tug, as well as her owner, recovered a salvage award. The Supreme Court there cites The Minnehaha, supra, and other English and American cases. Cf. The City of Portland, 5 Cir., 298 F. 27, 30.

Kovell's libel alleges of the value of the salvage services of himself and the three other men in boarding and saving the barge "That the sum of $5,000 for each barge is a reasonable sum to allow as and for salvage."

 We hold the combined services of Kovell and the three other men launching the lifeboat, taking her to the barge and making the several attempts to put Kovell on the barge, and taking the lifeboat back to the tug are entitled to a salvage award of 10% of the salved value of each of the two barges. Of this 10%, Kovell, who did not return with the lifeboat, is entitled to one-fourth of one-half or 1.25% of the salved value of each of the barges and we award him that amount. For Kovell's services in boarding one of the barges and thereafter making possible the salvage of both, we award him 25% of the salved value of each of the barges. Because of his limitation on his claim, Kovell's award shall not exceed 26.25/35, that is 75% of $5,000, or $3,750 for each barge.

Kovell's libel alleges that he is suing on behalf of others interested in the salvage. Such a proceeding is desirable to avoid a multiplicity of libels. Appellee's answer alleges that Kovell was not authorized by such other persons so to sue in their behalf and each of the others testified he had not authorized Kovell so to sue.

 None, however, seemed to be advised that in such a libel in rem against the barges he could ratify Kovell's libeling on behalf of the others or the latters' right to appear and each assert his claim for his particular participancy in the salvage. Cf. The Flottbek, 9 Cir., 118 F. 954, 959; The Sabine, 101 U.S. 384, 388, 25 L.Ed. 982.

While the limitation of the recovery to $5,000 per barge is binding upon Kovell, it is not on any of the others appearing, each being entitled to frame his claim for himself. The district court may entertain a motion of any claimed salvor to become a party to the proceeding if he be so advised.

The decree is reversed. The district court is ordered (a) to enter an interlocutory decree in favor of Kovell; (b) to determine the amount of his award upon the precentages above found; (c) to enter a final decree in his favor, and (d) to entertain such proceedings with respect to claims against the salvaged barges as to it may seem proper.