In re YAMASHITA–SHINNIHON KISEN, as Owner of the MOTORSHIP SUWA-HARU MARU, Plaintiff, in a Cause of Limitation of Liability.

In re HELLENIC INTERNATIONAL SHIPPING, S.A. as Owner of the TANKER MANDOIL, II, Plaintiff, in a Cause of Limitation of Liability.

Civ. Nos. 68–113, 312, 431, 432 and 563.

United States District Court
D. Oregon.

Sept. 16, 1969.

---

Franklin, Olsen, Bennett, DesBrisay & Jolles, Portland, Or., for death and personal injury claimants.

Kell & Alterman, Clifford B. Alterman, Lent, York, Paulson & Bullock, Edwin A. York, Carney & Haley, Leo R. Probst, Portland, Or., for salvage claimants.

Wood, Wood, Tatum, Mosser & Brooke, Erskine B. Wood, Portland, Or., for Yamashita-Shinnihon Kisen and Iwai & Co., Ltd.

King, Miller, Anderson, Nash & Yerke, Curtis W. Cutsforth, Portland, Or., for Hellenic International Shipping, S. A.

Detels, Draper & Marinkovich, Martin P. Detels, Jr., Seattle, Wash., for U. S. Oil & Refining Co.

## MEMORANDUM DECISION

BEEKS, District Judge.

These consolidated petitions for limitation of liability present many issues. This memorandum decision resolves two of them.

The first involves claims by Hudson Waterways Corp., (Hudson) owner, the master and the thirty man crew of the American steam tanker TRANSONEIDA

for a salvage award against (1) Yamashita-Shinnihon Kisen, (Yamashita) the owner of the Japanese motor ship SUWAHARU MARU (SUWAHARU); (2) Iwai & Co., Ltd., (Iwai) the owner of the cargo of logs laden on said vessel; (3) Hellenic International Shipping, S. A., (Hellenic) owner of the Liberian steam tanker MANDOIL II (MANDOIL), and (4) U. S. Oil & Refining Company (U. S.), owner of a crude oil cargo laden in said vessel, for the saving of property, and for the saving of life against Yamashita and Iwai.

At 1450[1] February 28, 1968 the SUWAHARU, bound from Coos Bay, Oregon, to Nagoya, Japan, was in collision with MANDOIL, bound from Sumatra, Indonesia, to Tacoma, Washington, at a point approximately 300 miles west of the mouth of the Columbia River. At the time of the collision TRANSONEIDA was enroute from San Pedro, California, to Whittier, Alaska, and approximately 95 miles southeasterly of the point of collision.

At 1550 TRANSONEIDA received the distress signal of SUWAHARU that she was on fire forward and needed immediate help. Whereupon TRANSONEIDA proceeded to the position of the distressed vessel.

At 2056 TRANSONEIDA arrived in the collision area and hove to at the request of the KURE MARU, the first vessel to arrive in the collision area, and hence the "control vessel." At this time there was heavy fog.

At 2102 the KURE MARU requested that TRANSONEIDA proceed on her course as her assistance was not needed and the fog presented a danger of collision.

At 2105 TRANSONEIDA resumed its course but at 2140 received a request from the Thirteenth Coast Guard District at Seattle requesting it to remain on the scene for the purpose of providing radio-telephone assistance in an air drop of medical personnel to provide attention for the master of MANDOIL who was badly burned and in need of medical assistance.

At 2221 the KURE MARU advised TRANSONEIDA that it was proceeding to Westport, Washington with the crew of MANDOIL and asked that TRANSONEIDA watch SUWAHARU as the latter could not move. TRANSONEIDA replied in the affirmative. The survivors of MANDOIL were eventually taken to Astoria, Oregon.

At 0046 February 29th the Coast Guard requested TRANSONEIDA to remain on the scene to coordinate.

At 0125 SUWAHARU requested permission to transfer its crew to TRANSONEIDA while the sea was calm as her master did not believe SUWAHARU could withstand heavy weather. SUWAHARU further requested TRANSONEIDA to watch until arrival of the Coast Guard cutter which was expected the evening of March 1st.

During the early morning of February 29th the master and crew of SUWAHARU transferred to TRANSONEIDA by the use of her own lifeboat and ascended to the deck of TRANSONEIDA by use of a Jacobs ladder. None of the crew of TRANSONEIDA left TRANSONEIDA during this operation. TRANSONEIDA gave food and blankets to the crew of SUWAHARU. Between 2150 and 2302 twenty-nine members of the crew transferred to the Coast Guard cutter IVY by means of the latter's motor lifeboat.

At 0708 March 1st the remaining eight members of the crew of SUWAHARU were transferred to the IVY by the same method.

At 0738 March 1st TRANSONEIDA resumed her voyage to Whittier, Alaska.

At 1200 March 1st TRANSONEIDA, pursuant to instruction from Hudson, reversed course and proceeded to the vicinity of MANDOIL.

At 1341 a boarding party from the Coast Guard cutter MODOC boarded

1. All times are approximate.

MANDOIL and returned to the MODOC at 1445.

At 1717 a boarding party of eleven members of the crew of TRANSONEIDA, headed by the Chief Mate, and including the Chief Engineer, Third Mate and Boson, left TRANSONEIDA and rowed a lifeboat of said vessel to MANDOIL, boarding the same by means of a Jacobs ladder hanging over the stern.

It was the unsuccessful intention of the boarding party to place a line from MANDOIL to TRANSONEIDA and to this end they placed two coils of light line aboard the lifeboat. The smallest line was a light non-metallic line $\frac{1}{4}''$ in diameter. The other, commonly known as a "heaving line," also non-metallic, was approximately $\frac{1}{2}''$ in diameter. The $\frac{1}{4}''$ line was bent to the $\frac{1}{2}''$ line, which which was bent to a 3" (circumference) line and this in turn was bent to $8\frac{1}{2}''$ boarding lines. The latter lines remained aboard TRANSONEIDA and they were made of braided poly-dacron fibers.

TRANSONEIDA had 300 fathoms of 3" line and nine 200 fathom lengths of $8\frac{1}{2}''$ line. The boarding party intended to trail the line from TRANSONEIDA to MANDOIL and then pull the heavy line aboard the latter vessel by use of the lighter line.

At 1850, shortly after the boarding party started to pull the line aboard MANDOIL, however, the $\frac{1}{2}''$ line parted at the stern chock through which it passed.

The boarding party spent the night of March 1st–2nd aboard MANDOIL.

The Canadian salvage tug SUDBURY II arrived in the vicinity of MANDOIL at 1954 March 1st and at 0845 March 2nd the TRANSONEIDA boarding party delivered up MANDOIL to a boarding party from the tug SUDBURY II, returned to TRANSONEIDA in their lifeboat at 0935 and TRANSONEIDA resumed course for Whittier at 1042.

On March 2nd the tug ARTHUR FOSS put a line aboard SUWAHARU and towed her to Victoria, British Columbia, arriving at said destination at 2300 March 7th, for which salvage service Foss Launch and Tug Company (Foss) was paid the contract sum of $30,050.00.

Eleven members of the crew of MANDOIL lost their lives, eight Greek and three Filipino seamen. Others received injury. The Court has been informed, however, that an amicable disposition has been made of the personal injury claims, and that they are withdrawn.

The factual matters aforesaid are not in dispute. The services rendered by TRANSONEIDA divide themselves into two distinct periods: (1) from 1550 February 28th, when TRANSONEIDA received the distress signal from SUWAHARU, until 0738 March 1st when TRANSONEIDA resumed her voyage to Whittier, Alaska, and (2) from 1200 March 1st, when TRANSONEIDA reversed course and proceeded to the vicinity of MANDOIL until 1042 March 2nd when TRANSONEIDA resumed course for Whittier. These periods will be referred to as First Period and Second Period.

During First Period the principal services of TRANSONEIDA were directed to the care of the SUWAHARU crew, and assisting the U. S. Coast Guard in providing medical attention for the Master of MANDOIL who was horribly burned and in need of medical assistance. The Commander of the Thirteenth Coast Guard District has characterized this service as a quick and competent response to a call for help which undoubtedly prevented a more serious loss of life and an excellent example of a seaman's humanitarian concern for a brother in distress. I agree.

During First Period, however, TRANSONEIDA provided a salvage service, primarily to SUWAHARU and to a lesser extent to MANDOIL. At the time of TRANSONEIDA'S arrival in the casualty area there was heavy fog, which remained until approximately 2254 when it started to clear. During this period MANDOIL could be seen through the fog as she was afire, but SUWAHARU

could not be seen and the sea in this area was littered with floating logs which became separated from SUWAHARU'S deck load as a result of the collision, all of which presented a degree of danger.

The salvage service rendered by TRANSONEIDA, as it relates to property, was of a low order, sometimes characterized as a "standby service." TRANSONEIDA at all times during obscured visibility maintained a lookout as well as a radar watch for the purpose of ascertaining the presence of and giving warning to other vessels in the area, and TRANSONEIDA was equipped with both wireless and radio telephone for use in giving aid and comfort to the distressed vessels.

In addition to an award for assistance in the saving of property claimants contend they are entitled to an award for life salvage service rendered to the master and crew of SUWAHARU. In this connection they urge that in fixing the award the Court should consider the agreed fee of $30,050.00 paid to Foss for towing SUWAHARU to Victoria, B. C.

The Life Salvage Act[2] does not provide compensation for life salvage, it only allows salvors of life who have participated in the services rendered on the occasion of the accident giving rise to salvage, a fair share of the property salvage award. Thus, whatever may be the social injustice involved, life salvors are entitled to only a fair share of the compensation awarded to property salvors. Their share must come out of the property award and they have no cause of action against the beneficiaries of their service. It would serve no useful purpose to discuss the right of claimants to participate in an award for the standby service aforesaid. The claimants who participated in each service are identical and a life salvage award would be nothing more than a participation by each in his own property award. Accordingly, the question is—are claimants entitled to

an award based upon the contract salvage towage paid Foss? I think not. The life salvage statute was intended to apply only to "reward" or "pure" salvage, and not to contract salvage. Furthermore, the statute contemplates that the saving of life must have been performed substantially at the time and while both lives and property were in distress and danger of loss. The EASTLAND, 262 F. 535 (7th Cir. 1919). Here it was not. The service performed by Foss was substantially after the master and crew of SUWAHARU were transferred to the Coast Guard cutter IVY and by said cutter transported to the mainland.

The services rendered by TRANSONEIDA during the Second Period are in substantial dispute. After careful consideration of all of the evidence I find that the boarding party from TRANSONEIDA performed the following services which were of benefit to MANDOIL:

1. They extinguished several smoldering fires in an awning of wood construction over the poop.

2. They extinguished a smoldering fire in the lazaret.

3. They secured the doors to the steering engine room which would serve to confine the fire in the adjacent paint locker should it break out again.

There was undoubtedly peril, but the evidence does not permit a finding as to the full extent thereof. The physical facts convince me that MANDOIL'S cargo was highly combustible, but I am unable to ascertain its explosive qualities. For many hours the vessel was engulfed by fire from burning oil over the entire area of the vessel abaft the impact area, including the bridge or midship house and the afterhouse. The fire was undoubtedly ignited by the oil spill resulting from the collision impact and ensuing rupture of some of the cargo tanks. Eventually the fire burned itself out as the oil spill was consumed. Without doubt the services were of benefit to MANDOIL and cargo because

2. 46 U.S.C. § 729.

they reduced the risk of further fire, I believe this to be particularly true with respect to the extinguishment of the several smoldering fires in the awning. The smoldering coals in the storage and reefer spaces below the main deck in the afterhouse area were contained and presented no great hazard. Those in the awning were exposed to the elements and hence to enlarging, spreading and scattering. The vessel's intact cargo tanks forward were subject to rupture from the heavy weather subsequently encountered. If such a rupture occurred and an oil spill resulted, the smoldering fires in the awning must be considered a possible source of ignition.

While I do not find that the TRANSONEIDA boarding crew was exposed to the risk of explosion I do find that there was risk of injury or loss of life in proceeding in an open lifeboat from TRANSONEIDA to MANDOIL and return. On both occasions, however, there were no unusual conditions of wind or sea, the risk involved being that inherent in an open boat exposed to the long swell of the North Pacific.

It is seriously urged by Hellenic and U. S. that claimants should be denied any recovery because they acted in bad faith. It is asserted that they did not at any time intend to render any service to the distressed vessel or cargo, their sole motive being to put a crew and line aboard MANDOIL to enable them to exact tribute from Island Tug & Barge Co. for the release of MANDOIL to SUDBURY II, the claimants knowing or suspecting that a tug or tugs had been or would be dispatched to take MANDOIL in tow.

I find that other than as heretofore stated TRANSONEIDA did not have a tow line on MANDOIL at any time and that in the condition of weather and sea which developed TRANSONEIDA was incapable of towing MANDOIL to Nootka Sound, B. C., or any other port of refuge on the Pacific Coast of North America.

There is not a scintilla of evidence to indicate that the master or crew of TRANSONEIDA acted in bad faith. There are circumstances from which a suspicion of improper motivation on the part of Hudson might be inferred, but such has not been established by a fair preponderance of the evidence and I do not so find.

■ U. S. and Iwai seek dismissal of the claims against them upon the ground that they have no in personam liability and that claimants' only remedy was to proceed in rem against the cargo. I am satisfied this is not the law, United States v. Cornell Steamboat Co., 202 U.S. 184, 194, 26 S.Ct. 648, 651, 50 L.Ed. 987, 992 (1906), wherein it is said:

> "The right to salvage may arise out of an actual contract, but it does not necessarily do so. It is a legal liability arising out of the fact that property has been saved; that the owner of the property, who has had the benefit of it, shall make remuneration to those who have conferred the benefit upon him, notwithstanding that he has not entered into any contract on the subject." [3]

and should not be the law for the reasons stated many years ago by Judge Benedict in Seaman v. Erie Ry. Co., Fed. Cas.No.12,582 at page 920:

> "Such a rule would cause unnecessary expense, and in many cases serious embarrassment to commerce, * * *."

One may best appreciate the practicality of an in personam remedy by imagining the extent and inconvenience which would have resulted had claimants proceeded in rem against the Iwai cargo after SUWAHARU had been repaired and was about to depart for Nagoya, Japan, or if claimants had proceeded in rem against each bargeload of oil as it arrived at Tacoma, Washington, on each

---

3. See also the Law of Salvage by Norris § 44, page 65. The Law of Admiralty, by Gilmore and Black, §§ 8-13, 14, pages 473-476, inclusive, and Robinson on Admiralty, pages 737, 742, and 743, together with the cases cited in each text.

of the fifteen successive and separate voyages which were necessary to accomplish the transshipment of the MANDOIL cargo from Nootka, B. C. to destination.

The Court awards claimants the sum of $5,000.00 for services rendered SUWAHARU and her cargo, which shall be apportioned in the following manner: The sum of $1,600.00 shall be divided into thirty-two shares. The Master of TRANSONEIDA shall receive two shares and each member of TRANSONEIDA'S crew one share. Hudson is awarded the balance of $3,400.00. The award shall be paid by SUWAHARU and Iwai in proportion to the net salved values of ship and cargo which I find to be:

| | |
|---|---|
| SUWAHARU— | $734,950.00 |
| Iwai cargo— | $510,375.75 |

I calculate this to be an award against SUWAHARU of $2,950.83 and against Iwai of $2,049.17.

The Court awards claimants the sum of $20,000.00 for services rendered MANDOIL and her cargo, which shall be apportioned as follows: The sum of $1,000.00 to each of the eleven members of TRANSONEIDA'S crew which boarded MANDOIL. The sum of $4,500.00 shall be divided into twenty-one shares of which TRANSONEIDA'S Master shall receive two shares and each of the nineteen members of TRANSONEIDA'S crew who did not board MANDOIL shall receive one share. Hudson is awarded the balance of $4,500.00. The award shall be paid by MANDOIL and U. S. in proportion to the net salved values of ship and cargo which the Court finds are:

| | |
|---|---|
| MANDOIL— | $127,800.00 |
| U. S. cargo— | $491,423.90 |

I calculate this to be an award against MANDOIL of $4,127.75 and against U. S. of $15,872.25.

Claimants shall recover their costs and interest at the rate of 6% per annum from March 2, 1968.

4. Appointed by the Oregon Circuit Court for Multnomah County.

Hellenic, U. S. and Island Tug & Barge have agreed that the award for salvage to which Island may be entitled, if any, shall be determined by arbitration in London pursuant to Lloyds Open Form Salvage Agreement. Island is not a party to these limitation proceedings and the rights of the parties in connection with the arbitration agreement remain undetermined. For these reasons I make no finding and I intend no inference as to the merit or lack of merit in Island's towage of MANDOIL to Nootka Sound, B. C. Furthermore, I make no finding and I intend no inference as to whether Hudson and Island entered into an enforceable agreement for a percentage participation by Hudson in any amount awarded Island as a result of the arbitration or whether the agreement between Island and Hudson, if any, was for the benefit of the Master and crew of TRANSONEIDA and/or whether a disposition was made with respect to the services performed by Hudson and/or the Master and crew of TRANSONEIDA prior to the release of MANDOIL to SUDBURY II. These issues will undoubtedly be resolved in the future, at which time proper allowance may be made of the awards herein by way of set off or credit, if required.

The second issue involves claims arising out of the death of ten members of the crew of MANDOIL, seven of them being Greek citizens and three being Philippine citizens. The personal representative [4] of the estates of said decedents filed a claim herein under the Death on the High Seas Act [5] on behalf of named beneficiaries of decedents of the classes named in said Act. Prior to the claims being filed representatives of Hellenic made settlements and obtained releases from all of the beneficiaries for whose benefit the claims for wrongful death were made. Settlement with the beneficiaries of four of the deceased Greek seamen were made in New York City, and they were represented by competent New York counsel. Settlement

5. 46 U.S.C. § 761 et seq.

with the beneficiaries of three of the deceased Greek seamen were made in Athens, Greece, at which time they were represented by competent Greek counsel, and the beneficiaries of the three Filipino seamen were consummated in Manila. Originally it was contended that the settlements were (1) inadequate, (2) obtained by overreaching, deception and fraud, and (3) that the beneficiaries were ignorant of their legal rights. At the time of trial, however, counsel representing death claimants withdrew all of said contentions except the first, and conceded that for the purposes of these proceedings the beneficiaries knew that they were releasing their rights under American and foreign law.

 The death claimants now take the position that the releases are a nullity because the cause of action for their benefit cannot be discharged without the approval of this Court[6] and this being so, that this Court should assess damages.

Counsel's argument relating to settlement restrictions is ingenious and poses a matter of first impression. Suffice it to say it is the policy of the law to encourage settlements. Birbalas v. Cuneo Printing Industries, 140 F.2d 826 (CA 7, 1944); Hartford Acc. and Indem. Co. v. Payne, 242 F.Supp. 888 (D.C.Or. 1965). This policy includes settlements with beneficiaries in a wrongful death action. McKeigue v. Chicago & N. W. Ry. Co., 130 Wis. 543, 110 N.W. 384 (1907). Edwards v. Sullivan, 200 Misc. 488, 102 N.Y.S.2d 951 (1950). Speiser, Recovery for Wrongful Death, p. 443. This being so, neither the Death on the High Seas Act nor the Limitation Act[7]

or proceedings are intended to be a bar to out of court resolution of claims. They are simply procedures available for those claims that cannot be settled.

Assuming, however, the settlements to be a nullity for any of the legal reasons advanced by counsel I find them all to be adequate.[8]

The death claims are dismissed. Each party shall bear his own costs. Counsel for Hellenic may prepare findings of fact, conclusions of law and decree in accordance herewith and submit the same within fifteen days of the date hereof, giving ten days notice to all interested parties.

---

6. Claimants contend that the filing of a limitation proceeding precludes an out of court settlement and that the Death on the High Seas Act requires the appointment of a personal representative, and approval by this court of a compromise disposition to make the settlement effective.

7. 46 U.S.C.A. § 183 et seq. Rule F of Supplemental Rules to Federal Rules of Civil Procedure.

8. The facts establish low earnings, total absence of minor children and in only one instance is there a wife. With the exception of the one surviving wife, the dependents are parents and in one instance an adult brother and an adult cousin. There is no reliable evidence of pecuniary loss by any beneficiary other than the one surviving wife.