**SAINT PAUL MARINE TRANSPORTATION CORP. et al., on its own behalf as owner and on behalf of the Master and crew of the M/V ST. PAUL, Plaintiffs,**

v.

**CERRO SALES CORPORATION, Defendant.**

**Civ. No. 3082.**

United States District Court,
D. Hawaii.

Sept. 30, 1971.

---

## DECISION AND ORDER

TAVARES, District Judge.

Fire broke out during the early morning hours of June 23, 1968 on board the Liberian vessel, S.S. NORTH AMERICA, then bound for Callas, Peru, when about 600 miles East South East of Honolulu, Hawaii, from which port the vessel had sailed on June 20, 1968. The vessel was laden with a cargo of copper concentrates having the stipulated value of $1,850,000. which was the property of the defendants. The fire was of such intensity as to cause the officers and crew to abandon ship in two of the vessel's life boats. Two members of the crew were lost at sea while attempting to abandon ship and were never recovered. The NORTH AMERICA for all practical purposes became a total loss and was later sold as scrap for $14,000.

The plaintiff in this action is the Saint Paul Marine Transportation Corp., a foreign corporation which was the owner of the M/V ST. PAUL, a single screw, 55,000 ton bulk carrier vessel, built in 1967 at Yokosuka, Japan, of an overall length of 718′ 6″, a beam of 104′ 2″ and a draft of 41′ 0⅛″. This vessel was tight, staunch and seaworthy, fully manned and equipped on June 23rd and 24th of 1968 during the times herein involved, and conservatively valued at about 4.5 million dollars.

The plaintiff corporation brings this action in Admiralty on its own behalf and on behalf of the Master and crew of the M/V ST. PAUL. Plaintiff seeks a salvage award based upon Admiralty and Maritime Law for that contribution which the ship, its Master and crew may have made toward the salvage and saving of the S.S. NORTH AMERICA and its valuable cargo of copper concentrates.[1] Action previously taken in this

Paul F. Cronin, Pratt, Moore, Bortz & Case, Honolulu, Hawaii, of counsel, for plaintiffs.

William L. Fleming, Cades, Cox, Schutte, Fleming & Wright, Honolulu, Hawaii, for defendant.

1. The crewmen who went on board the S.S. NORTH AMERICA were Anastasio, Schiano DiColo, Centamore, DiCara and Ruggiero. (Ex. P–1 at p. 11). Those of the boarding party who remained in the ST. PAUL life boat as crewmen but did not actually board NORTH AMERICA were Cafiero, Gargiulo and Scognamiclio. (Ex. P–1).

case has eliminated all defendants named in the complaint excepting Cerro Sales Corporation, owner of the copper concentrate cargo of the S.S. NORTH AMERICA.

Some time during the afternoon of July 23, 1968, and shortly before the ship was abandoned, a distress (S.O.S.) message was transmitted by the S.S. NORTH AMERICA. At about 1515 hours the M/V ST. PAUL received a radio transmission, originated by the U. S. Coast Guard in Honolulu, advising of the plight of the S.S. NORTH AMERICA and giving that ship's position at sea. The ST. PAUL notified the Coast Guard as to its own position and thereafter and at about 1600 hours the ST. PAUL received a message from the Coast Guard that the NORTH AMERICA needed assistance and that her crew were in life boats. The ST. PAUL, enroute to Japan, immediately altered its course for the position of the NORTH AMERICA. Within about two hours (Ex. P–35) ST. PAUL sighted NORTH AMERICA at a distance of about 12 miles. By Exhibit P–36, ST. PAUL advised Coast Guard she saw one life boat at a distance of about one mile. The survivors were picked up from both life boats by about 1800 hours, at which time the NORTH AMERICA was still burning with possible increased intensity. Two crewmen from the NORTH AMERICA were missing and ST. PAUL bent every effort toward finding them. After the Master of NORTH AMERICA was on board ST. PAUL the radio facilities of ST. PAUL were made available to him. Copies of his traffic with the agents and owners of NORTH AMERICA were received in evidence.

■ A review of all of the information contained in the radio traffic of the ST. PAUL is quite convincing and leads the Court to a conclusion that the communication services provided by the ST. PAUL not only contributed immeasurably to the eventual salvage of NORTH AMERICA but provided the factual basis upon which the success of the salvage venture was predicated and made possible.

In the sequence of events, ST. PAUL, before dark on June 23rd, advised Coast Guard that the crewmen had been picked up and that although there was still fire on board, the ST. PAUL would attempt to tow the NORTH AMERICA (Ex. 37). Conflicting evidence is contained in the record as to whether crewmen from ST. PAUL actually went on board the NORTH AMERICA on June 23rd. There is substantial evidence that they did, and the Court believes and finds from the more credible evidence that such a boarding did in fact take place. But even if there had been no actual boarding on June 23rd, this would not affect the results reached by this Court.

During the night of June 23rd and the early morning hours of June 24th the ST. PAUL stood by the NORTH AMERICA and maintained a radar watch upon her and the surrounding seas. After daylight, further search for the two missing seamen was conducted. ST. PAUL reported fire still burning on NORTH AMERICA. The Master of ST. PAUL had advised his owners in Italy on the 23rd that he would attempt to tow NORTH AMERICA; that darkness had overtaken his effort, and that the NORTH AMERICA had become very dangerous because of fire. He requested advice. Again after daylight on the 24th the Master told his owners that NORTH AMERICA was still smoking and that any effort to tow her would be a very dangerous operation which he did not propose to undertake. During the afternoon of the 24th, however, the undisputed evidence discloses that ST. PAUL put a boat in the water from

It may be well to note at this juncture that the Master and crew of the ST. PAUL were Italian. The answers to interrogatories and depositions before the Court are in the form of translations from Italian into English. One of the key factors bearing upon the Court's decision came about in open court through an interpreter called by the Plaintiff, which will be more fully discussed below.

which five men, above named, of the eight-man boat crew, did board the NORTH AMERICA. The evidence discloses that the boarding was an extremely hazardous undertaking for all hands, the small boat in heavy swells being brought alongside the large ship close enough for five men to cross over.

The mere bringing of a small boat alongside a large vessel in heavy swells, close enough for five men to cross over, is a peril of the seas well known and recognized by all who have gone to sea. The peril of being bashed against the larger vessel is borne almost equally by those who remain in the small boat and those who successfully transfer themselves to or from the larger vessel. Put another way—but for the skill and courage of the small boat handlers, no one would have been successful in going to or from the larger vessel.

The Court encounters no difficulty whatever in finding that an eight-man crew from the ST. PAUL approached the NORTH AMERICA on the afternoon of June 24th for the express purpose of attempting to put the NORTH AMERICA under tow of ST. PAUL. Although the evidence presented by the plaintiff may not be as specific and exacting as could be desired, when considered in light of the surrounding circumstances, including the time-lag before their statements and/or depositions were taken, and the language difficulties which were inherent in the situation, the Court does not have too much difficulty in reaching its conclusions. It must be remembered, also, that although these men were not salvors, they demonstrated that they were very capable seamen and their acts must be considered in such a light.

Sifting from the evidence presented, a rather clear picture emerges. Although the NORTH AMERICA was heavily laden, on June 24th when boarded from the ST. PAUL, she was down by the stern. The stern was not awash, but had less than normal freeboard, indicating that the vessel had taken on a considerable quantity of sea water.

The after section of the ship had not been subjected to the intense fire which had raged throughout the midsection of the ship. The poop-house and after accommodations had not been subjected to actual fire damage. The statement of DiColo as translated in open court by Mrs. Drain clearly indicates that he closed doors and portholes in the after accommodations, all of which had been left open (Ex. 7). He had entered this area because it also housed the steering engine and it was essential that NORTH AMERICA's rudder be amidships, if at all possible, before any tow was undertaken. Just ordinary seamanship dictates the closing of all possible openings through which sea water might otherwise enter a vessel. The Court finds no credible evidence to in any way contradict the conclusion that the ST. PAUL men did a seaman-like job in closing off the openings in the after accommodations. It was reported that water had entered this area. The credible expert testimony regarding conditions later found, very definitely substantiates plaintiffs' evidence in this regard. The fact that the lower portholes were in fact under water when the vessel was finally towed into port can leave no doubt whatever that had the portholes not been secured as they were, when they were, the vessel could very well have sunk before she was reached by the tug.

Continuing—The ST. PAUL crew found embers and smoldering fires working toward the after section of the ship. Some material was thrown overboard. Some fires were extinguished. Although it may be somewhat conjectural at this late date to say that but for the acts performed, the intact hatching of the after hold and the poop-house accommodation would have caught fire and burned, thereby subjecting the vessel to a greater exposure to the open sea, it is not unreasonable to find, and this Court does find, that the efforts of the crew did contribute to preserving a vital portion of the vessel's integrity, thereby making a substantial con-

tribution to the ultimate salvage of the cargo.

It is the Court's opinion, taking into account wind, weather, conditions of the sea, the condition of the NORTH AMERICA, the size and restricted maneuverability of the ST. PAUL on the afternoon of June 24, 1968, and all of the facts and circumstances shown by the entire record of this case, that if the ST. PAUL had not performed the acts noted above, the NORTH AMERICA would have sunk before the salvage tug reached her.

In any event, the ST. PAUL crew were able to string the insurance wire, emergency tow line, carried on board the NORTH AMERICA, to the ST. PAUL, which had come into exceedingly dangerous proximity to the NORTH AMERICA. An attempt to tow was made for about half an hour, when the line parted. The length of tow line available, lack of cantonary, and the condition of the sea (Exhibit 12) militated against a successful tow. The Master of ST. PAUL was convinced that the ST. PAUL did not have the capability of making a successful tow. In truth and fact, there was nothing more which the ST. PAUL could accomplish. The ST. PAUL did stand by until the morning of the 25th of June, when she departed from the NORTH AMERICA for Honolulu, where she put the survivors of the NORTH AMERICA ashore on June 26th, and then resumed her voyage for Japan. Quite obviously the bare attempt to tow the NORTH AMERICA contributed nothing whatever to the cargo salvage and its failure likewise detracted nothing from the success which the crewmen had otherwise achieved.

The Dillingham Corporation, which operates a tug line and towing service in Honolulu and elsewhere, was in receipt of complete information regarding the plight of the NORTH AMERICA, most of which was obtained from the radio transmissions of the ST. PAUL. On June 26, 1968, Dillingham dispatched its tug MALIE to the area of the NORTH AMERICA's last reported position. On July 2nd the MALIE found the NORTH AMERICA abandoned and still adrift. She put a tow line on the NORTH AMERICA and successfully towed the vessel into Honolulu harbor, arriving there on July 5, 1968. On that day Dillingham, on behalf of itself, the Master and Crew of the tug MALIE, brought an action in this court (Civil No. 2845) for salvage against the NORTH AMERICA and its cargo. Plaintiff herein, eight months later, sought to intervene in Civil 2845, seeking both life salvage and property salvage awards. On May 13, 1969, the motion for intervention was denied because of the proximity to trial of the Dillingham action. The Court did not dismiss the ST. PAUL's action, but treated it as a separate complaint as then filed. (Record herein pps. 99–103). Dillingham, owner of the towing tug MALIE, received $59,225.92 as their salvage award and costs of $35,374.51. The nine crewmen of the tug MALIE were awarded a total salvage award of $20,000. The awards were apportioned on a ratio of $14,000 (for which the NORTH AMERICA was sold as scrap) to $1,850,000 (the stipulated value of the salvaged cargo).

The defendant here called Ronald Kahapea, who testified that he and Valentine Lewis were crewmen of the tug MALIE and were the first ones to board the NORTH AMERICA when the tug reached her. An effort was made to present this witness as saying that he found the doors to the poop-house open. The full examination of this witness failed to establish that the doors to the poop-house were in fact open upon the arrival of the tug. It would be quite illogical under the evidence presented to conclude that experienced Italian seamen whose purpose on board the NORTH AMERICA had been to rig her for tow had left doors open which they said they had closed.

Probably the most significant evidence presented came from Mr. John Walsh, an expert witness presented by the plaintiff, and one of three surveyors who surveyed the NORTH AMERICA

upon her arrival at Honolulu. Mr. Walsh has impressive credentials and presented himself and his testimony in a manner most persuasive upon the Court. The ship was carrying about 15′ of water in the engine room upon arrival at Honolulu. She was down by the stern to such an extent that portholes in the after section of the hull were submerged. The shaft alley running aft from the engine room was flooded. By design the shaft alley is open and connected to the poop-house. He expressed the opinion that much of the flooding found had to be from water which entered through the open doors in the poop-house area, and demonstrated by calculation that the leakages in the engine room and plumbing openings could not have admitted the quantity of water which was found therein. Water which entered the after house would find a normal flow down through the open shaft alley connecting to the engine room. The ship was in a critical condition when she arrived at Honolulu. She had been pumped out to some extent off the Big Island of Hawaii enroute to Honolulu. Under such conditions any water which had been denied entry contributed greatly to keeping the vessel afloat. He explained that the leaks which did exist in the engine room were flowing continuously and that very little additional water would have been sufficient to sink the vessel. He pointed out that if No. 5 hatch had burned, the fire could well have spread aft to the poop-house, thus creating additional openings for sea water. No hull ruptures had occurred. Fire in the after accommodations could well have caused porthole breakage, which in and of itself could have admitted sufficient additional water to cause the vessel to sink. Like reasoning leads to the conclusion that the mere closing of these portholes by the ST. PAUL personnel in all probability saved the NORTH AMERICA.

Considering all of the expert testimony presented, nothing substantially refutes the opinions expressed by Mr. Walsh.

"A salvage award is decreed in a court of admiralty not in the way of a mere quantum meruit for work and labor performed, but as a bounty given on grounds of public policy to insure safety of property and life at sea; to promote commerce in trade; to save and restore property to its owners; to induce and encourage others to risk life and limb, if need be, in the interest of saving distressed property; and to eliminate any temptation on the part of rescurers to despoil the saved property." The Law of Salvage by Martin J. Norris, at page 370.

In Section 63 of the text treatise by Norris, supra, the author sets forth the three elements essential to every valid salvage claim as:

a. Property in peril on navigable waters;

b. Voluntary services;

c. Success in whole or in part.

The discussions above relate the convictions of this Court as to the satisfaction of these essential elements.

The most recent citation of authority which has come to the Court's attention is Re Yamashita-Shinnihon Kisen, 305 F.Supp. 796 (D.C.Or.1969). That case was a collision case wherein the vessel SUWAHARU MARU collided with the MANDOIL 300 miles off the mouth of the Columbia River. TRANSONEIDA went to the scene in answer to a distress call from the SUWAHARU. Another vessel in the area, the KURE MARU, advised TRANSONEIDA she would not be needed, and she departed. She returned back to the scene upon U. S. Coast Guard request that she provide message assistance in connection with a proposed airdrop of medical personnel to aid a crewman of the MANDOIL. KURE MARU departed the scene at 2221 with the crew of MANDOIL. TRANSONEIDA stood by to watch SUWAHARU. Coast Guard requested that TRANSONEIDA remain as coordinating vessel. During the early hours of the following day the crew of SUWAHARU using their own life boat, board-

ed TRANSONEIDA and were provided food and blankets. One day later the crew were transferred by the Coast Guard to their cutter, and TRANSONEIDA resumed her voyage. The District Court decision speaks of the foregoing as the first period.

The period designated as the second period commenced at about noon of March 1, 1968, the day of TRANSONEIDA's departure from the scene. Her owners directed that she return and she reached MANDOIL at about 1717. An eleven man party of TRANSONEIDA crewmen were put on board MANDOIL via a Jacobs ladder of that vessel. These men endeavored to rig a tow line but after the line which they were attempting to pull on board the MANDOIL parted, the effort ceased. The men spent the night on MANDOIL but turned her over to a tug the following morning and returned to their own vessel, which departed the area at 1042 on March 2. The tug towed MANDOIL to port.

The owner and crew of TRANSONEIDA claimed a salvage award from the owners of SUWAHARU and MANDOIL and against the cargo owners of both vessels.

The most able decision of Judge Beeks, a recognized authority on admiralty law among the bench and bar of this circuit, offers helpful guidance for determining the matter before this Court. Judge Beeks included the "standby services" of maintaining a radar watch over the two disabled vessels and providing communications throughout the first period as salvage services to be properly considered in the granting of an award to claimants.

Turning to the second period, the Judge held that extinguishing smoldering fires and securing doors to confine and prevent the spread of other fire were services which were of benefit to MANDOIL.

This Court has considered the perils encountered by seamen from ST. PAUL in the situation before this Court on a comparative basis with those outlined and considered by Judge Beeks under the facts before him. From the factual situation, discussed above, this Court has concluded that the entire boarding party from the ST. PAUL faced substantially greater perils than did the party from the TRANSONEIDA in boarding the MANDOIL in the Beeks case.

Having reached the conclusions expressed above, the Court faces the problem of trying to arrive at a price tag to attach to the salvage services which plaintiffs rendered, in formulating an award for the claimants. About the only specific figures available to the Court appear as Exhibit P-5C, the list of expenditures for food and clothing given to the survivors; the testimony of Captain John Thornton placing his estimate of the costs of operating the ST. PAUL at $3,000 per day with a fuel consumption of about $840.00. ST. PAUL's diversion was in round figures three days at $3,840 per day, or $11,520. In keeping with the bounty policy, above quoted from Norris, the ST. PAUL should be reimbursed for its actual expense with some premium attached thereto. In situations such as here presented, it is the Master and the Owners who control the actions of a ship. They had no knowledge whatever regarding the value of cargo in distress, which here happens to have been $1,850,000. Partly to discourage unwarranted speculation, this Court believes that a sum of $200,000 is a reasonable sum for award to the M/V ST. PAUL, its officers and crew. Of the foregoing salvage award, the sum of $15,000. shall be paid directly to the ST. PAUL, as reimbursement for costs and expenses.

The Court has fully considered the positions espoused by the defendants. In defendant's Reply Brief considerable stress is placed upon the alleged conflicts shown by plaintiffs' evidence as to whether crewmen from the ST. PAUL boarded the NORTH AMERICA on the 23rd, and other alleged discrepancies. The Court has considered the language

problem presented and all other circumstances above noted, including the time factor, and in resolving the matter has based its final conclusions on the mostly undisputed testimony as to what transpired on the 24th, the more credible portions of the evidence taking all circumstances into consideration, including reasonable inferences from the credible testimony, circumstantial evidence, and all other relevant evidence.

■ The Court finds that this action was commenced well within the two-year limitation on salvage suits as established by 46 U.S.C. § 730, and finds nothing in the authorities which would shorten the statutory limitation prescribed by Congress or which would invoke the doctrine of laches to shorten the prescribed period under the circumstances here presented.

Defendant has strenuously urged upon the Court the proposition that although a salvage suit may be brought by the owner of the salvaging vessel on behalf of her officers and crew, it is incumbent upon such plaintiff to produce some proof of authority to act in a representative capacity to the trial court.

Defendant's Reply Brief, p. 3 recites:

"Thus in Greene v. United States (S.D.N.Y.1952) 104 F.Supp. 667, relied upon by plaintiff, the court said, as plaintiff has indicated, that 'it would have been sufficient if the captain had asserted that it [the suit] was brought on behalf of the officers and crew without naming them.' However, the court went on to say 'whether or not they [officers and crew] acquiesced or ratified in the bringing of the suit * * * is for determination upon the trial.' ",

and,

"In short, it is not a matter of pleading, to which defendant has no objection; it is a matter of proof. Here no evidence has been produced that these seamen acquiesced in or ratified the bringing of this suit. To the contrary, the evidence was that they had not. Consequently, the action, while bearing the title of a representative action (which is quite proper) is seen in fact not to be one.",

and,

"Nothing in Holmes v. City of New York (2 Cir. 1929) 30 F.2d 366 or The Flottbek (9 Cir. 1902) 118 Fed. 954 is to the contrary. The latter case held that it was not necessary to 'name' the officers and crew in the libel. The case did not hold that it was unnecessary for them to appear or ratify the actions of the persons purporting to represent them or otherwise indicate a desire to participate in the suit."

■ In the Court's opinion, the cases have not held that it was necessary for them to independently appear or ratify. In the *Greene* case, supra, the court there, in addition to the language quoted by defendant above, further pointed out, 104 F.Supp. at p. 668:

"The fact that the crew members, or some of them, may not expressly have authorized Kimes to sue on their behalf, does not preclude him from continuing the suit as their representative. A captain or other person standing in the same relationship to the crew acts on the basis of implied authority in bringing a salvage suit. In the instant case, the libel had attached to it the list of crew members and officers for whom the Captain purported to act. This is the better practice, but it would have been sufficient if the Captain had asserted that it was brought on behalf of the officers and crew without naming them. The Flottbek, 9 Cir., 118 F. 954, 958. 'But even if the names did not appear, the court would have had the power to award a specific sum for their services, and retain the money in court, until proper steps were taken to ascertain their names.' The *Flottbek*, supra; Castner, Curran & Bullitt, Inc., v. United States, supra [2 Cir., 5 F.2d

214]; The Camanche, 8 Wall. 448, 19 L.Ed. 397.",

and,

"Of course, a suit may not be continued against the wishes of the crew members. Whether or not they acquiesced or ratified in the bringing of the suit or repudiated it either because of unwillingness to participate or preference to bring separate suits is for determination upon the trial. See Kovell v. Portland Tug & Barge Co., 9 Cir., 171 F.2d 749; Knowles v. War Damage Corporation, 83 U.S. App.D.C. 388, 171 F.2d 15, 18, certiorari denied 336 U.S. 914, 69 S.Ct. 604, 93 L.Ed. 1077."

The Court here subscribes to the theory of implied authority. Although not named in plaintiffs' complaint, the evidence introduced does disclose the names of the entire crew and further specifies those who crewed the life boat for boarding the NORTH AMERICA and those crewmen who participated in the actual boarding. As in The *Flottbek* case, supra, even if the names did not appear, the Court has the power to award a specific sum for their services, and retain the money in court, until proper steps are taken to ascertain their names. The language adopted from The *Flottbek* decision clearly precludes any burden of proof upon the plaintiff beyond the implication of authority in the absence of some evidence to or showing sufficient to place it in issue. The Court has failed to locate any cases which express any view contrary to this holding.

Regarding defendant's defense of abandonment, the conclusion in this regard reached by Judge Beeks in Re Yamashita-Shinnihon Kisen, 305 F.Supp. 796, supra, appeals to this Court as dispositive of the contention, and as noted above, is adopted for the conclusions reached herein.

Defendants have presented other specific items in their defense, but of those not discussed in detail herein the Court has not found sufficient merit in them

to alter the findings and conclusions expressed herein.

In accordance with the foregoing, it is hereby ordered, adjudged and decreed that of the above recited $200,000.00 award 65% shall go to the ST. PAUL and her owners, including the $15,000 sum as reimbursement for costs and expenses. The remaining 35% shall go to the Officers and Crew of the ST. PAUL. The first mate shall receive an extra sum of $1,000 and each other crewman of the boarding party, including those crewmen who remained in the ST. PAUL's small boat, shall receive an extra sum of $500.00, the remainder to be shared by all officers and crewmen of the ST. PAUL, to be apportioned in accordance with their respective rates of pay as of the time period of the incident involved herein. Judgment shall be prepared accordingly, with provision that the entire sum of $70,000. payable to the Officers and Crew shall be paid into court and distributed according to the judgment upon separate verified receipts and English certification of entitlement.