In the Matter of the Complaint of TA CHI NAVIGATION (PANAMA) CORP. S.A., as Owner of the S.S. EURYPYLUS for Exoneration from or Limitation of Liability.

CAROLINA FLORAL IMPORT, INC., et al., Plaintiffs,

v.

M.V. "EURYPYLUS", her engines, boilers, etc.; Ta Chi Navigation (Panama) Corp., S.A.; and Ta Peng Lines, Defendants.

TA CHI NAVIGATION (PANAMA) CORP., S.A., Plaintiff,

v.

S.S. "LARRY L", her engines, etc., El Fortuna Inc. and Seres Shipping Inc., Defendants.

EL FORTUNA INC., as Owner of the M/V "LARRY L" on its behalf and on behalf of the Master, Crew and Charterers of the M/V "Larry L", Plaintiffs,

v.

Certain Cargoes of the Vessel "EURYPYLUS", Defendant.

Nos. 75 Civ. 5994 (CHT), 75 Civ. 5768 (CHT), 75 Civ. 5920 (CHT) and 77 Civ. 380 (CHT).

United States District Court, S.D. New York.

April 4, 1984.

Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, for petitioner; Vincent Barra, James E. Ryan, New York City, of counsel.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for various cargo claimants; Joseph M. Mangino, Keith B. Dalen, New York City, of counsel.

Donovan, Maloof, Walsh & Kennedy, New York City, for claimant, Citibank, N.A.; Charles C. Goodenough, James P. Krauzlis, New York City, of counsel.

Healy & Baillie, New York City, for claimants, master and crew of Larry L; Raymond A. Connell, John P. James, New York City, of counsel.

Freehill, Hogan & Mahar, New York City, for claimants, JANICE L, Her owner, master and crew; Eric E. Lenck, New York City, of counsel.

Giallorenzi & Campbell, New York City, for claimants, owner, charterers and certain crew members of LARRY L; Edward A. Keane, New York City, of counsel.

Hill, Betts & Nash, New York City, for claimant, Devine Diving & Salvage, Inc.; Michael J. Ryan, New York City, of counsel.

TENNEY, District Judge.

These actions, involving claims for salvage, have been consolidated with the exoneration/limitation proceedings instituted by Ta Chi Navigation (Panama) Corp., S.A. ("Ta Chi"). The actions arise out of the fire and explosion aboard the vessel S.S. EURYPYLUS and its subsequent abandonment on November 10, 1975 while the ship was en route from Kobe, Japan to the Panama Canal. The salvage claims filed in these proceedings include claims by Elseguro Inc. ("Elseguro"), the alleged

owner of the M/V JANICE L,[1] claims by El Fortuna, Inc. ("El Fortuna"), the alleged owner of the M/V LARRY L,[2] and a claim by Fred Devine Diving and Salvage, Inc. ("Devine"), the owner of the SALVAGE CHIEF.

Commencing on January 29, 1979, a trial was held before this Court solely on the issue of whether the petitioner Ta Chi should be entitled to exoneration from and/or limitation of liability. Thereafter, this Court denied exoneration/limitation to Ta Chi. *Complaint of Ta Chi Navigation (Panama) Corp.*, 504 F.Supp. 209 (S.D.N.Y.1980). This decision was appealed to the Court of Appeals for the Second Circuit, which on April 14, 1982 remanded the case to this Court for further proceedings consistent with its opinion. 677 F.2d 225.

This Court, having indicated that it would hear the various salvage claims at the same time as the hearing on the remand, conducted hearings for these purposes on October 13 and 14 and on November 16, 1982. On October 26, 1983, this Court filed its opinion on remand, again denying exoneration/limitation to Ta Chi. *Complaint of Ta Chi Navigation (Panama) Corp.*, 574 F.Supp. 418 (S.D.N.Y.1983). The Court has now decided the salvage claims, and for the reasons stated below the Court holds that the JANICE L should be awarded a small sum for its salvage efforts; that the LARRY L is not entitled to a salvage award; and that Devine is entitled to $60,936.52 plus interest.

## BACKGROUND

Since some familiarity with the prior opinions describing the explosion and fire will be assumed, *see id.;* 504 F.Supp. 209, it is sufficient to state that the disaster occurred at about 1:50 P.M. on November 10, 1975, that the EURYPYLUS, 491 feet in length with a gross tonnage of 8,601 tons, was abandoned approximately one hour later; that following the explosion and fire the vessel was without electricity; and that wireless communication was limited to a small emergency hand-powered transmitter. Her location by dead reckoning was Latitude ("Lat.") 24° 15′ N, Longitude ("Long.") 119° 35′ W. The vessel was on fire in the main accommodation housing; the fire extended through that structure and into the three holds aft of it and into an abutting hold forward. The ship had been deprived of all fire fighting capability. At the time the ship was abandoned four of the crew members had been seriously burned and several others had less severe burn injuries.

## DISCUSSION

The salvage claims will be considered chronologically, that is, in the order of the appearance of the claimants on the scene of the disaster.

### Claims of the JANICE L

On November 10, 1975 the JANICE L was en route from the Panama Canal to Dairen, China, carrying cargo under a time charter party to China National Foreign Trade Transportation Corporation of Peking. The JANICE L, built in 1968, was a bulk carrier of dry cargo, carrying grain for private charters. She was 182 meters (597 feet) in length, and 27,382 deadweight tons. According to the testimony, the agent for the vessel, which was under the Greek flag, was Seres Hellenic Shipping Enterprises, Ltd. of Greece ("Seres Hellenic"), Trial Transcript ("T.") at 62; the subagent in the United States was Seres Ship-

---

1. The claims of Elseguro and El Fortuna include the claims of the owner, the ship, the charterers, the master, and crew. For reasons of brevity, the ship names will be used to cover all these claims. Accordingly, depending upon the context the name of the ship will be used to denote either the parties to the litigation or the ship itself.

2. The firm of Giallorenzi & Campbell (formerly Giallorenzi & Stiles) appeared as attorneys for the Owners, Master and Crew of the LARRY L. By stipulation and order dated December 21, 1977, Healy & Baillie were substituted as attorneys for the Master and nine officers and crew of the LARRY L. Thereafter, by Notice of Reassignment dated May 5, 1978 the aforementioned claim was reassigned to this Court.

ping, Inc. ("Seres"). *Id.* The subagent obtained the charters for the vessel.[3]

At 10:35 P.M. on November 10, 1975 the JANICE L sighted a ship on fire ahead of her at a distance of thirteen miles—approximate position Lat. 24° 38′ N, Long. 119° 38′ W. She sounded her alarm, ordered lifeboats prepared for lowering, and reported to the United States Coast Guard by radio. By 11:00 P.M. she had approached the vessel sufficiently to sight a lifeboat at a considerable distance from the burning vessel and at 11:15 P.M.,[4] while circling to pick up the first boat, sighted another boat. She proceeded to pick up 19 survivors from the second lifeboat, two of whom were badly burned and had to be put aboard with the help of a crane. A motorboat from the JANICE L, which had gone to rescue the survivors in the first lifeboat sighted, broke down and it was necessary for the ship at 2:00 A.M. on November 11 to retrieve it. It rescued four survivors from that boat, including the master, who advised that the abandoned vessel was the EURYPYLUS. At 2:20 A.M. a Coast Guard plane appeared on the scene, and with its assistance the JANICE L picked up 11 survivors from a third lifeboat at 4:00 A.M. Two of these survivors were seriously burned. Finally, between 6:30 and 8:10 A.M. a fourth boat with 2 survivors was recovered. A total of 36 officers and crewmen were rescued.

After the master of the EURYPYLUS was brought aboard the JANICE L at approximately 2:00 A.M. on the 11th, he sent two radio telegrams to Kee Yah Shipping Company ("Keeship"), Ta Chi's agents in Taipei, Taiwan. The first message advised them of the explosion and abandonment of the ship, the rescue by the JANICE L, and the number rescued; the second message gave the names of four missing crewmen and the names of the seriously burned and advised them that the latter were to be hospitalized via United States Coast Guard helicopter. Janice L Exhs. 5 and 6.

Contemporaneously, the JANICE L communicated with her owner's subagent, Seres, and reported the discovery of the EURYPYLUS, the rescue of her master and crew, the loss of four crewmen who were missing and presumed dead, and the injury of four crewmen who were seriously burned. Seres' house counsel, Livanos, checked and determined that the EURYPYLUS was owned by Ta Chi, and that its agent in the United States was Transnational Maritime ("Trans Mar") in New York whom he contacted for instructions. T. at 63–64. Trans Mar directed that the survivors be taken to the nearest port. Livanos replied that the JANICE L could salvage the ship and take the survivors to Honolulu, which was on her projected route to China. T. at 65.

---

**3.** The master of the LARRY L, Captain Georgios Sarris ("Captain Sarris"), testified that Seres Hellenic actually owned the vessels it managed that were under the Greek flag. However, it had a name for the owning company, e.g., El Fortuna, which it used internationally to transact business. *See* Larry L Exh. 13A at 101–102. Captain Sarris had sailed for Seres Hellenic for fifteen years as a master. *See* Larry L Exh. 13 at 7–10. The first mate, Adamantios Frangos, testified that the LARRY L was owned by Seres Hellenic in Piraeus, Greece. Before sailing on the LARRY L and while working for Seres Hellenic the first mate had sailed on the ANNITSA L, the CAPTAIN JOHN L, and the CAPTAIN GEORGE L. Larry L Exh. 14 at 7. Marc Livanos ("Livanos"), house counsel for Seres in New York at the time of the accident, testified that the owner of the JANICE L was Elseguro, that Seres Hellenic in Piraeus, Greece was the agent of Elseguro, and that Seres in New York was the

subagent of Seres Hellenic. T. at 61–62. He testified that the same relationships existed as to the LARRY L except that there were different owners. T. at 83–85. He admitted to a very close relationship between Seres and Seres Hellenic but did not know the names of the presidents of either Elseguro or El Fortuna. T. at 140. Finally, in the time-charter of the JANICE L the owner is stated to be Seres Hellenic. Janice L Exh. 12. Although these issues are not vitally pertinent to the present salvage claims, the Court is of the opinion that Seres Hellenic was not the agent of El Fortuna, but its owner; that El Fortuna was a wholly owned subsidiary or merely a nominee of Seres Hellenic; and that Seres was the agent of Seres Hellenic in the United States.

**4.** At midnight the clocks on the JANICE L were retarded one hour due to change in time zone.

By 8:10 A.M. on November 11 the rescue of the survivors had been completed. The JANICE L was aware that four of the crew were missing. At that time it seems clear that the JANICE L intended to take EURYPYLUS in tow and proceed to Hawaii with the disabled ship and her survivors. However, the condition of the seriously burned survivors was deteriorating, and by the time the Coast Guard plane had departed at 8:20 A.M., it was decided that the JANICE L would proceed on a true course of 40° from the position of EURYPYLUS until she rendezvoused with a helicopter that would transport the injured men to a hospital in the United States. At that time the JANICE L was some 18 miles from the EURYPYLUS.

At 10:40 A.M., on course 40°, the JANICE L passed close to the EURYPYLUS, and according to the JANICE L's log, Janice L Exh. 4 at 3, "perceived something which appeared like a person requesting help." Although the weather conditions were "worsening," id., at 11:20 A.M. a lifeboat with 6 crewmen at the oars was lowered and endeavors were made to board the ship. These were not successful until 2:30 in the afternoon, when the crewmen, using a line and pilot ladder brought from their vessel, finally succeeded in boarding the EURYPYLUS near #3 hold. Even though it was not possible to proceed aft of the accommodation house a search was made for survivors. This was unsuccessful and the JANICE L was so informed. Following this, the crew attempted to attach a line from the EURYPYLUS to the JANICE L. The latter ship made an approach along the starboard side of the EURYPYLUS and Ikonomakos, a member of the boarding crew, attempted to pass a line to his ship but failed. Janice L Exh. 1 at 24. The six crewmen then got into the lifeboat with the light line which had been made fast to the anchor winch on the EURYPYLUS and brought it to the JANICE L. However, during this attempt to tow the ship, the line broke. In the course of these operations the JANICE L collided with the starboard side of the EURYPYLUS leaving a thirty-three foot hole in the forward part of that

vessel near her bow. See Ta Chi Exh. QQQ, at 83, 208. After this collision the attempt to tow the vessel was abandoned, and the JANICE L, at 5:30 P.M. on November 11, continued on a true course of 40° to its rendezvous with the helicopter.

Meanwhile, Livanos called Trans Mar back and informed them that the survivors would be taken to the nearest port. Although there is no documentary evidence of the imposition of conditions by Seres, Livanos claims that the rights to salvage were expressly reserved. T. at 65. Whether Livanos' call was on November 11 or 12 is not clear. It is clear, however, that on November 12 Seres received two messages from Trans Mar. The first requested that the JANICE L be diverted to the nearest convenient port to discharge all the survivors of the EURYPYLUS. The second advised that the towage services of the JANICE L were no longer required since Trans Mar was arranging a towage contract. Janice L Exh. 9; T. at 67–68. Livanos was also informed by Trans Mar that it had requested that the Coast Guard send a helicopter to pick up the four seriously burned survivors. T. at 68–69.

On November 11 at 5:30 P.M., after the JANICE L resumed her mission to rendezvous with the helicopter, the master of the EURYPYLUS sent another radio message to the owners in Taiwan advising them of the position of his ship when it was abandoned—Lat. 24° 15′ N, Long. 119° 35′ W—and its position when he last saw it on the afternoon of November 11—Lat. 23° 50′ N, Long. 119° 40′ W. He further advised that when they reached port he would telephone a request for cash to pay for the survivors' shoes and clothes. Janice L Exh. 7. It seems clear that he did not know then which port that might be.

The JANICE L reached the rendezvous position—Lat. 25° 09′ N, Long. 118° 17′ W—shortly after 3:00 A.M. on November 12, 1975, but was instructed to continue on course until 8:00 A.M. because the helicopter could not reach the rendezvous. Similar instructions were received at 8:00 A.M., and the rendezvous was finally effected at

10:45 A.M.—Lat. 26° 30′ N, Long. 117° 30′ W. Janice L Exh. 4; Appendix to Janice L Post Trial Memorandum. By 11:00 A.M. the four seriously burned survivors had been raised to the helicopter, and the JANICE L proceeded—"[f]ull ahead to our destination"—no longer on a true course of 40° but to the northwest on a true course of 351°. *Id.* It was not until 4:55 P.M. on November 12 that Seres instructed the JANICE L to proceed to Cedros Island, west of Baja California, Mexico, which was then almost directly abeam approximately 125 miles to the east. *Id.* Altering course some 95° to the east, she reached the Cedros Island anchorage and, with the assistance of a captain of a United States ship, cleared and landed the survivors at 5:30. By 6:00 A.M. on the morning of November 13, the JANICE L was en route "to [her] destination Dairen, China—true course 270°." *Id.* On the following day, November 14, the JANICE L radiogrammed Keeship in Taiwan and informed it of the helicopter transfer and the disembarkment of the other survivors. Janice L Exh. 8.

On January 13, 1976 Seres presented Trans Mar an invoice for $29,856.63 for deviation and other expenses in connection with the "[s]alvage of crew of M/V Eurypylus at sea—November 1975." Janice L Exh. 10. Accordingly, claimant Elseguro, as owner of the JANICE L, seeks an award of $29,856.63 for its rescue and deviation expenses. In addition, or alternatively, it seeks a salvage award in the amount of $50,000 to be paid either as a part of the award given to the other salvors or as an independent property salvage award.

■ In order to recover a traditional salvage award, the salvor must prove three essential elements: "[1] marine peril; [2] service voluntarily rendered, not required by duty or contract; and [3] success in whole or in part, with the service rendered having contributed to such success." *B.V. Bureau Wijsmuller v. United States,* 702 F.2d 333, 338 (2d Cir.1983). "Volunteer assistance rendered to such property when in peril, and which is successful in saving the property or some portion of it, constitutes the proper foundation to support an action for salvage *in rem* against the ship and cargo or the proceeds thereof." *The Sabine,* 101 U.S. 384, 389, 25 L.Ed. 982 (1879); *Markakis v. S/S Volendam,* 486 F.Supp. 1103, 1106 (S.D.N.Y.1980); *In re Sun Oil Co.,* 342 F.Supp. 976, 981–82 (S.D. N.Y.1972), *aff'd,* 474 F.2d 1048 (2d Cir. 1973). "[A] claim for salvage in an American court arises out of the *jus gentium* and does not depend on the local laws of particular countries." *Sobonis v. Steam Tanker Nat'l Defender,* 298 F.Supp. 631, 635 (S.D.N.Y.1969) (citing cases).

Life salvage, unlike *jus gentium* or traditional property salvage, is a statutory creation. In 1912 Congress enacted what is now 46 U.S.C. § 729 (1976) which provides as follows: "Salvors of human life, who have taken part in the services rendered on the occasion of the accident giving rise to salvage, are entitled to a fair share of the remuneration awarded to the salvors of the vessel, her cargo, and accessories."[5]

---

5. At the same time § 729 was enacted, Congress also enacted 46 U.S.C. § 728 which reads as follows:

> The master or person in charge of a vessel shall, so far as he can do so without serious danger to his own vessel, crew, or passengers, render assistance to every person who is found at sea in danger of being lost; and if he fails to do so, he shall, upon conviction, be liable to a penalty of not exceeding $1,000 or imprisonment for a term not exceeding two years, or both.

Accordingly, it can scarcely be argued that life salvage is a voluntary act, as is the case with property salvage, nor does § 729 require that life salvage be voluntary. This Court has denied property salvage by construing the salvor's acts as involuntary under 33 U.S.C. § 367 which requires, in a collision case, that the master stand by until it appears that the other ship does not need further assistance. *See In re Sun Oil Company, supra,* 342 F.Supp. at 982–83 (S.D.N. Y.1972).

Both 46 U.S.C. §§ 728 and 729 were enacted by Congress in fulfillment of the obligation imposed by Article 12 of the International Salvage Treaty to which the United States was one of the many parties. Articles 11 and 12 of that Treaty read as follows:

Article 11

Every master is bound, so far as he can do so without serious danger to his vessel, her crew and passengers, to render assistance to

In order to make a claim for life salvage the claimant, in addition to saving lives, must "have taken part in the services rendered on the occasion of the accident giving rise to [traditional] salvage." If he has, "he is entitled to a fair share of the [traditional salvage]." Thus, life salvage is not an additional award, but a fair share of the traditional award. Accordingly, the courts have held that a life salvage award can be granted only to those who have forgone the opportunity to engage in the more profitable work of traditional property salvage. *See Markakis v. S/S Volendam, supra,* 486 F.Supp. at 1110 n. 28 (citing cases); *Saint Paul Marine Transp. Corp. v. Cerro Sales Corp.,* 313 F.Supp. 377, 379 (D. Hawaii 1970) (hereinafter *St. Paul I*). Otherwise, life salvage "would be nothing more than a participation by each [salvor] in his own property award." *In re Yamashita-Shinnihon Kisen,* 305 F.Supp. 796, 800 (D.Or.1969). Furthermore, the life salvage services must be contemporaneous with the traditional salvage services in which the life salvor is entitled to share. *The Eastland,* 262 F. 535 (N.D.Ill.1919); *St. Paul I,* 313 F.Supp. at 379. Finally, life salvors are not entitled to share in a contract salvage award. *In re Yamashita-Shinnihon Kisen, supra,* 305 F.Supp. at 800.

Insofar as life salvage is concerned, the instant case is quite similar to *St. Paul I.* In that case the ST. PAUL received a radio message on June 23, 1968 from the United States Coast Guard that the NORTH AMERICA was afire in its vicinity and needed assistance. The ST. PAUL diverted course and came upon the NORTH AMERICA an hour later, took aboard crewmen from two lifeboats, and notified the Coast Guard and the owners of the NORTH AMERICA of her abandonment by its officers and crew and of her location and condition. Shortly thereafter the ST. PAUL's crew boarded the NORTH AMERICA, fought the fires, closed compartment doors and rigged a tow line running to the ST. PAUL. When an attempt to tow was made, the line parted. Before the attempted tow, the ST. PAUL had cruised around looking for missing seamen. On the following day, June 24, after again cruising around looking for missing seamen, the ST. PAUL put five of its crew aboard the NORTH AMERICA to fight fires and, in the afternoon, another tow line was attached. The second attempt to tow ended shortly when the tow line parted. Thereafter the ST. PAUL gave up the attempt to tow and proceeded to Honolulu, landing the NORTH AMERICA crew there on June 26, 1968. Meanwhile, the tug MALIE had been dispatched in an attempt to salvage the vessel. The MALIE located the NORTH AMERICA on July 2, 1968 and on July 5 towed her into Honolulu, at which time the MALIE brought an action for salvage. The ST. PAUL sought life salvage in a separate action.

The district court denied any award of *life salvage* to the ST. PAUL on two grounds. The court stated:

> Here, the St. Paul was in no manner inhibited in its property salvage efforts by the fact that it picked up the crew of the North America out of the two lifeboats. The St. Paul's crew members twice boarded the North America, carried on salvage work, and twice the St. Paul tried to tow her but each time the tow lines parted. Then the St. Paul gave up all salvage efforts—not to "save lives" but because it just could not tow the North America.

everybody, even though an enemy, found at sea in danger of being lost.

The owner of the vessel incurs no liability by reason of contravention of the foregoing provision.

Article 12

The High Contracting Parties whose legislation does not forbid infringements of the preceding article bind themselves to take or to propose to their respective legislatures the measures necessary for the prevention of such infringements. . . .

*Warshauer v. Lloyd Sabaudo S.A.,* 71 F.2d 146, 147–48 (2d Cir.1934).

Greece is a signatory to the International Salvage Treaty, so that the master of the JANICE L would be subject to the above provisions. *See Nicholas E. Vernicos Shipping Co. v. United States,* 223 F.Supp. 116, 119 (S.D.N.Y.1963).

Moreover, while it is claimed that the St. Paul did perform work which aided in the ultimate salvage of the ship and cargo (a matter not herein decided), St. Paul's life salvage efforts, vis-a-vis the services of Dillingham in the actual and successful finding, boarding and towing of the North America into Honolulu, were not "rendered on the occasion of the accident." It was on June 24, 1969, that the St. Paul gave up its own salvage attempts and proceeded to Honolulu. It was not until July 2, eight days later, that, after intensive and prolonged search, the Malie found the North America abandoned and adrift, and took her in tow. St. Paul's life salvage efforts were here not performed either actually or even substantially at the time the Malie was searching for and picking up the North America. Plaintiff therefore can have no derivative right under 46 U.S.C. § 729 to any of the property salvage awards made to Dillingham or the Master and crew of the Malie.

313 F.Supp. at 379 (footnote omitted).

It is important to note that the district court in *St. Paul I* was concerned with whether life salvage could be awarded under those circumstances, and not with whether property salvage could be awarded. That court reached that issue at a later point.

In the instant case, there is no serious question that the JANICE L, after taking aboard the survivors of the EURYPYLUS and purportedly searching for further survivors aboard that ship, made at least two unsuccessful efforts to take the EURYPYLUS in tow. During the second of these she collided with and seriously damaged that ship. The question therefore arises whether the JANICE L "gave up all salvage efforts—not to 'save lives' but because it just could not tow the [EURYPYLUS]." *Id.* at 379. The Court concludes that it gave up because it could not tow her.

Furthermore, the JANICE L's life salvage efforts from November 10 to 13, like those of the ST. PAUL were not rendered on the occasion of the property salvage but some 6 or 10 days prior thereto. The LARRY L arrived on the scene on November 19, and the contract salvor, Devine, arrived on November 23. Accordingly, for the foregoing reasons, the Court holds that the JANICE L has no right under 46 U.S.C. § 729 to a life salvage award.

Apparently aware of the weakness of her life salvage claim, the JANICE L relies on *Peninsular & Oriental Steam Navigation Co. v. Overseas Oil Carriers, Inc.*, 553 F.2d 830 (2d Cir.), *cert. denied*, 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977) (hereinafter *Peninsular & Oriental*), to support a quasi-contract claim for reimbursement for its rescue and deviation expenses of $29,856.63. In essence the JANICE L seeks to change the traditional rule against awards for pure life salvage. The facts of the *Peninsular & Oriental* case, set forth in the appellate opinion, may be summarized briefly as follows.

The OVERSEAS PROGRESS, an American flag tanker owned by defendant Overseas Oil Carriers ("Overseas Oil"), was en route from Haifa, Israel to Baltimore when on July 4, 1973 a member of her crew was stricken with a heart attack. The OVERSEAS PROGRESS did not have a doctor aboard, but, guided by the ship's medical books and radio advice from the Public Health Service, her officers attempted to care for the stricken man. When, on the following day, he had a further attack, the master of the OVERSEAS PROGRESS called by radio for responses from all vessels in the vicinity with a doctor aboard. The nearest vessel to respond was the CANBERRA, a British flag passenger vessel owned by Peninsular & Oriental Steam Navigation Company, an English company. She was en route from Dakar, Senegal to New York. She had a maximum speed of 25 knots and was equipped with her own hospital and medical personnel. The OVERSEAS PROGRESS sent a second message to the CANBERRA requesting a rendezvous and the transfer of the stricken crew member. At that time the OVERSEAS PROGRESS was 740 miles from the

nearest hospital in Newfoundland. The OVERSEAS PROGRESS, a vessel of approximately 13,000 gross tons with a maximum speed of about 13.8 knots, could not have reached there in less than 57 hours. The CANBERRA, by increasing her normal speed to 25 knots, was able to effect the rendezvous in 6½ hours. After the transfer was made, the CANBERRA resumed her course to New York, still at 25 knots, and arrived there only 2½ hours later than her scheduled arrival, but she had to travel an additional 232 miles to save the life of the crewman.

Although Overseas Oil, as owners, paid CANBERRA's surgeon for services rendered, it refused to pay Peninsular & Oriental for the expenses incurred due to the extra distance travelled at increased speed, including the additional fuel consumed. Suit was instituted in this court, and the district court granted summary judgment to Overseas Oil, except that it granted an award for nursing services. The decision was based on the traditional rule that there could be no award for pure life salvage where there was no simultaneous recovery of property.

The court of appeals, although critical of this traditional doctrine, did not direct an award of life salvage, nor could it have done so, since Peninsular & Oriental was not asking for life salvage as a share of a nonexistent property salvage award but rather as reimbursement for its expenses. However, the Court on a theory of quasi-contract awarded the owners of the CANBERRA $8,500 as reimbursement for their expenses.

A key factor in the court's decision in *Peninsular & Oriental* was the observation that the owner of the OVERSEAS PROGRESS had a "maintenance and cure" obligation to the stricken seaman. Once the seaman became ill the ship was obligated to provide him with swift medical care and to take him speedily to a shore facility where the necessary care could be given. The court held that the CANBERRA had performed this duty on behalf of the OVERSEAS PROGRESS. The court noted

that the services of the CANBERRA were immediately necessary to prevent injury or suffering. A significant factor in its quasi-contractual analysis was the fact that the OVERSEAS PROGRESS, having in fact requested the aid, had knowledge of and gave consent to the actions taken by the CANBERRA. The following statement of the court is instructive:

> Although the law ordinarily frowns on the claims of a "mere volunteer", there is a class of cases where it is imperative that a duty be performed swiftly and efficiently for the protection of the public or an innocent third party, in which a "good Samaritan" who voluntarily intervenes to perform the duty may receive restitution for his services. This rule has become crystallized in the doctrine that performance of another's duty to a third person, if rendered by one qualified to provide such services with intent to charge for them, is a ground for recovery in quasi-contract. This principle is limited to cases where the services are immediately necessary to prevent injury or suffering.

553 F.2d at 834 (citations omitted).

While the rescue of the crew of the EURYPYLUS by the JANICE L was of a somewhat different nature, it appears to fit comfortably within the quasi-contractual requirements established by *Peninsular & Oriental*. Most significantly, and, in contrast to many rescues at sea where the survivors may not require emergency medical attention, the JANICE L rescue involved several severely burned seamen who required prompt treatment. The services of the JANICE L were necessary to prevent suffering and perhaps to save the lives of these men. Certainly, the captain of the EURYPYLUS was in no position to provide the proper "maintenance and cure" at that time since the EURYPYLUS was totally disabled. Nor was Ta Chi able to provide the assistance since the JANICE L could not be reached by a doctor via helicopter.

Ultimately, the Court must conclude that the JANICE L performed the "mainte-

nance and cure" duty which Ta Chi owed to all of the injured crewmen. This includes the four taken off by helicopter at the rendezvous point and the remaining injured crew members dropped off at Cedros Island.

The other major factor which brings this claim within the rule set forth in *Peninsular & Oriental* and which may set it apart from many other rescues at sea is that here Ta Chi made a specific request to Elseguro that the JANICE L perform certain services. Ta Chi requested a rendezvous with a helicopter to obtain emergency medical treatment for the four seriously injured crew members and a discharge of the remaining crew at Cedros Island.[6]

It is true that the services performed by the JANICE L in this instance were more in the nature of transportation to medical aid than medical aid itself. In contrast to the CANBERRA, the JANICE L had no medical doctor on board and was only able to provide first aid treatment. This should not, however, detract from the position that the services of the JANICE L constituted a form of "maintenance and cure." In *Murphy v. American Barge Line Co.*, 169 F.2d 61 (3d Cir.), *cert. denied*, 335 U.S. 859, 69 S.Ct. 133, 93 L.Ed. 406 (1948), it was determined that the shipowner not only had the obligation to furnish medical care, but also the duty to provide the means to transport an ailing crew member to a doctor or hospital. The *Peninsular & Oriental* court also clearly recognized this aspect of "maintenance and cure." "On vessels that do not carry a surgical staff, the ship's master has a duty, in the sound exercise of his judgment and depending on the circumstances, to have the seaman taken speedily to a hospital or the nearest port where surgical care may be obtained." 553 F.2d at 834 (citations omitted). Accordingly, the Court finds that on a theory of quasi-contract the owner of the JANICE L is entitled to reimbursement for its *proper* expenses, as set out in the margin, and not for the somewhat inflated expenses claimed.[7]

6. There is no question that Ta Chi's agents sent a message to Elseguro, care of Seres, on November 12 and that this message was received by Seres on that date. It read as follows:

FOR HUMANITARIAN REASONS AND MEDICAL REASONS, WE STRONGLY REQUEST YOU DIVERT SS "JANICE L" NEAREST CONVENIENT PORT TO DISCHARGE ALL CREWMEMBERS OF "EURYPYLUS"
Janice L Exh. 9.

7. The JANICE L has presented a bill dated January 13, 1976 under the letterhead of Seres. Janice L Exh. 10. It reads as follows:

m/v JANICE L – JAN – 9145
Salvage of crew of m/v EURYPYLUS
at sea – November 1975

---

Time Lost due to Deviation

| | | |
|---|---|---|
| A) | 3 days–4 hours–12 min. or 3.175 days [at] $7,005.00 per day | $22,240.88 |
| B) | Crew O/Time 3.175 days [at] $150.00 per day | 476.25 |

Bunkers Used:

---

| | | |
|---|---|---|
| | 51. M/T I.F.O. [at] $82.84 per M/T | 4,224.84 |
| | 10.4 M/T D.O. [at] 119.71 per M/T | 1,244.98 |
| C) | Radiograms by Capt. C. Hans  £ 77.88 [at] $2.10 | 163.55 |
| D) | Cigarettes to seaman  £ 15.30 [at]  2.10 | 32.12 |
| E) | Victualliing 36 men [at] 2 days [at] 3 meals = 216 meals [at] $1.50 per meal | 324.00 |
| F) | Agency fee (Seres Shipping Inc.) | $950.00 |
| G) | Communications expenses (Seres Shipping) | 200.00 |

| | |
|---|---|
| NET | $29,856.63 |

This bill is based in part on the following computations.  Janice L Exh. 11.

DELAYS IN VOY #48 DUE TO SALVAGE 36 CREW MEMBERS
OF S.S. EVRIPULUS [sic] BETWEEN THE DATES NOV. 10TH –
NOV. 13TH, 1975

| FROM: | TO: | DIST: | TIME | F.O | D.O |
|---|---|---|---|---|---|
| NOON/11–10–75 LAT.24–20N LONG.117–04W | 23:35/11–10–75 LAT.24–10N LONG.119–25W | 139 Mls | 10H–35M | 10,0M/T | 0,5M/T |
| 22.35/11–10–75 LAT.24–10N LONG.119–25W | 17:30/11–11–75 LAT.23–51N LONG.119–26W | 22 Mls | 19H–55M | NIL | 3,1 |
| 17:30/11–11–75 LAT.23–51N LONG.119–36W | 10:45/11–12–75 LAT.26–30W LONG.117–10W | 208 Mls | 17H–15M | 17,0 | 3,8 |
| 10:45/11–12–75 LAT.26–30N LONG.117–10W | 17:00/11–12–75 LAT.27–47W LONG.117–23W | 78 Mls | 6H–15M | 6,0 | 0,5 |
| 17:00/11–12–75 LAT.27–47N LONG.117–23W | 01:30/11–13–75 CEDROS ISLAND ANCHORAGE | 127 Mls | 9H–45M | 9,0 | 0,7 |
| 01:30/11–13–75 CEDROS ISLAND ANCHORAGE | 06:00/11–13–75 CEDROS ISLAND ANCHORAGE | NIL | 4H–30M | NIL | 0,3 |
| 06:00/11–13–75 CEDROS ISLAND ANCHORAGE | 14:42/11–13–75 LAT.27–55N LONG.117–04W | 111 Mls | 8H–42M | 9,0 | 1,5 |

TOTALS:    DIST.685 Mls    TIME: 03D–04H–12M    F.O 51,0M/T    D.O 10,4M/T

The initial entry in the computations covering distance, time, and oil is not correct. The EURYPYLUS was not sighted until 10:35 P.M. (22.35).  While the "translation" of the log of the JANICE L gives the time as 8:35 (20.35) the original log shows the later time 22.35.  Janice L Exhs. 3 and 4.  Any deviation charge for the period 12:00 noon to 11:35 P.M. is incorrect, and is disallowed.  This results in a reduction in total distance to 477 miles, in time to 3.735 days, fuel oil to 41 tons ($3,396.44), and diesel oil to 9.9 tons ($1,185.13).  Thus in the bill

| | | |
|---|---|---|
| A) | should be reduced to | $19,158.68 |
| B) | " " " " | 410.25 |
| Fuel Oil | " " " " | 3,396.44 |
| Diesel | " " " " | 1,185.13 |
| C) | Approved | 163.55 |
| D) | " | 32.12 |
| E) | " | 324.00 |
| F) | Disapproved | –0– |
| G) | Approved | 200.00 |
| | | $24,870.17 |

■ However, this does not close the matter insofar as the JANICE L is concerned. Even though she is not entitled to life salvage pursuant to 46 U.S.C. § 729, the issue remains whether she is entitled to property salvage. There is no question that a ship, denied life salvage, may still be entitled to the traditional property salvage. This was the situation in *Saint Paul Marine Transp. Corp. v. Cerro Sales Corp.,* 332 F.Supp. 233 (D.Hawaii 1971), *aff'd,* 505 F.2d 1115 (9th Cir.1974) (hereinafter *St. Paul II*), a companion case to *St. Paul I. See also The William Rockefeller,* 55 F.2d 904, 905 (2d Cir.1932). It will be recalled that in *St. Paul I, supra,* the ST. PAUL was denied life salvage because it had discontinued all salvage efforts not to save lives, but because it just could not tow the NORTH AMERICA. However, in *St. Paul I* the court did not consider whether any property salvage award should be made to the ST. PAUL. In the second action the ST. PAUL sought a property salvage award. In that action it was found that the vessel and crew of the ST. PAUL, while failing to effect a tow of the NORTH AMERICA did put some eight crewmen aboard the burning vessel. The crewmen closed doors and portholes in the after accommodations and extinguished fires which might have consumed the after hatches. These actions contributed to the preservation of a vital portion of the vessel's integrity, and, thereby, substantially contributed to the ultimate salvage of the NORTH AMERICA by the tug MALIE. The court found that "the mere closing of [the] portholes ... in all probability saved the NORTH AMERICA." 332 F.Supp. at 238. The court also found that the radio information and "communication services provided by the ST. PAUL not only contributed immeasurably to the eventual salvage of

NORTH AMERICA but provided the factual basis upon which the success of the salvage venture was predicated and made possible." *Id.* at 235.

In the instant case the crew members of the JANICE L boarded EURYPYLUS purportedly to search for survivors but primarily to rig lines to tow the ship. T. at 65. No effort was made to fight fires or improve the vessel's integrity. Indeed, the vessel's integrity was diminished by the collision with the JANICE L. However, the JANICE L did perform a service which was beneficial to the shipowner and cargo interests. She notified the Coast Guard of the disaster and transmitted information to Ta Chi about the disaster and the location of the vessel.

"One who is the means or instrumentality of securing or bringing aid to the distressed ship can be a salvor. Securing aid or assistance to the salved vessel, thus enabling her to be placed in a position to be saved is a salvage service." 3A M. Norris, Benedict on Admiralty § 26, at 2–19 to –20 (6th ed. 1983) (footnote omitted). "[S]tanding by" at the scene of a disaster and making available wireless and radio communication facilities have been characterized as property salvage services "of a low order." *In re Yamashita-Shinnihon Kisen, supra,* 305 F.Supp. at 800.

In the instant case the Coast Guard was alerted to the distressed vessel by the JANICE L before the vessel was identified. However, the Coast Guard made no effort to salve the vessel since its prime concern was the preservation of life. The more important messages for the purpose of this claim were those sent by the master of the EURYPYLUS via the communication facilities of the JANICE L to the owners advising them of the disaster to their vessel, its

The alleged agency fee to Seres is disallowed. This is said to represent a charge made by Seres to Seres Hellenic. T. at 78. There is no documentary support for this charge.

The Court is aware that the JANICE L was paid full hire for the period of time she deviated. This was on the representation to the charterer by Seres that it would not share in the salvage if it didn't pay. T. at 98. Since no

award will be made to the shipowner or the charterer for life salvage, the Court will approve the deviation expense for the account of the charterer. The payment of overtime is approved in a corrected amount even though such overtime was not payable under the employment contract, but will be reflected hereinafter in the determination of an equitable property salvage award.

location at the time of the disaster, and when it was last observed. Janice L. Exhs. 5, 7 and 8.

The Court finds that the JANICE L is entitled to a property salvage award for forwarding reports by the master of the EURYPYLUS to her owner since this furthered the ultimate property salvage. This award, however, excludes the services rendered in the unsuccessful attempt to tow.

■ In determining the amount to award in a successful salvage operation, courts usually consider the value of the ship and cargo salved, as well as the value of the salvor ship. But this is not necessarily required where, as here, the attempted salvage effort was unsuccessful and indeed inflicted damage on the distressed ship.[8] Hence, the elements which courts usually consider in determining the amount of the salvage award are not of particular importance in the instant case.[9] Where the property salvage consisted of little more than securing aid the recent awards in this circuit have been relatively small. *Nicholas E. Vernicos Shipping Co. v. United States*, 349 F.2d 465, 472 (2d Cir.1965) (2 months wages); *Nadle v. M/V Tequila*, 377 F.Supp. 414, 418 (S.D.N.Y.1974) ($5000); *Conolly v. S.S. Karina II*, 302 F.Supp. 675, 682 (E.D.N.Y.1969) (master and crew awarded $6300).

■ While the court granted an unusually large property salvage award in *St. Paul II*, it has been suggested that this was dictated in part by the prior disallowance of life salvage. *See* G. Gilmore & C. Black, The Law of Admiralty § 8–12, at 572 (2d ed. 1975), and the award in that case should not be used as a guideline for this case. It is clear that the crew of the ST. PAUL performed services far more valuable in the ultimate salvage than did the crew of the JANICE L. Furthermore, although the JANICE L has been denied "life salvage" she can recover on a quasi-contractual basis for those services. Included in the latter recovery are charges for radiograms in the sum of $163.55. Janice L Exh. 10. The Court also takes note that the JANICE L received no damage and none in her crew were reported injured. While all those concerned aboard the JANICE L behaved creditably, the survivors were rescued from EURYPYLUS lifeboats with the assistance of the Coast Guard plane and without difficulty except as to the transfer of the seriously burned to the JANICE L.

For all of the above reasons, the Court concludes that the communication services furnished by the JANICE L were worth no more than $8000, of which $2000 is payable in equal shares to the alleged owner, Elseguro and the charterer, $1000 to the master of the JANICE L, and $5000 to the other officers and crew, to be apportioned in accordance with their respective rates of pay as of the time period of the incident involved herein. The Court also finds that interest, computed at commercial rates from November 12, 1975, should be awarded. As previously noted, Elseguro is also entitled to reimbursement for expenses incurred in the sum of $24,870.17, *see* note 7, *supra*, with interest at commercial rates from January 13, 1976. The above payments are chargeable against Ta Chi but subject to the prior lien of Devine.

---

**8.** The stipulated value of the JANICE L was fixed at $3,780,000. T. at 78. The value of the EURYPYLUS in her damaged condition and her bunkers was stipulated as $161,162.20. The value of the cargo was stipulated as $1,490,789.03. Letter to this Court from Healy & Baillie (October 7, 1982).

It should be noted that the JANICE L never filed any libel against EURYPYLUS or her cargo in California. T. at 82.

**9.** Such elements are: (1) the degree of danger from which the lives and property are rescued; (2) the value of the property saved; (3) the risk incurred by the salvors in securing the property from the impending peril; (4) the promptitude, skill and energy displayed by the salvors in rendering the service and saving the property; (5) the value of the property employed by the salvors in rendering the service and the danger to which such property was exposed; and (6) the time and labor expended by the salvors in rendering the salvage service. 3A M. Norris, *supra*, § 244, at 21–2. *See also B.V. Bureau Wijsmuller v. United States, supra*, 702 F.2d at 339.

*Claims of the LARRY L*

Between the 10th and 12th of November, 1975, while the JANICE L was rescuing the EURYPYLUS crew and attempting to tow that vessel, the LARRY L was in Vancouver, British Columbia completing the loading of a cargo of grain destined for a Black Sea port in Russia via the Panama Canal. Purportedly the LARRY L was owned by El Fortuna.

The LARRY L, like the JANICE L, was a bulk carrier of dry cargo that carried grain for private charters. She was built in Japan a few years after the JANICE L. Her deadweight tonnage was 27,306—slightly less than that of the JANICE L—but they were practically identical vessels, both 182 meters (597 feet) in length. In addition to the physical similarities between the two vessels, there were other ties between them. Like the JANICE L, the LARRY L was also a Greek flag vessel. Both operated under the agency (if not the ownership) of Seres Hellenic and their subagent in the United States was Seres. Seres obtained the charters for both vessels as well as others.[10]

It was customary for vessels operating under the agency of Seres to receive and exchange information as to the movement of other Seres vessels. Accordingly, the master of the JANICE L, unhappy with the terminated effort to salve the EURYPYLUS, called the master of the LARRY L in Vancouver via radiotelephone. He advised him of the situation with respect to the EURYPYLUS and stated that he expected to reach Cedros Island around dawn. Larry L Exh. 13–A, at 143–144. Since the master of the JANICE L did not know definitely that he was to go to Cedros Island until 5:00 P.M. on November 12, he must have reached the master of the LARRY L shortly before that vessel departed the loading silo at 6:57 P.M. on the 12th. The chief engineer of the LARRY L testified that he heard about the JANICE L and the EURYPYLUS from the master of the

LARRY L while they were in Vancouver on November 12, 1975. Larry L Exh. 15, at 36–37. Seres was also in telephonic communication with the master of the LARRY L at or about this time and on November 12 had received the message addressed both to Elseguro and to Seres advising that Trans Mar, as owners/agents, would not require the further services of the JANICE L as Trans Mar was arranging for a towage contract on the EURYPYLUS. Janice L Exh. 9.

From the recital which follows, including testimony as to the use of codes, the courses followed, the failure to produce copies of the wireless and radio traffic of the LARRY L for the period from November 13 to 19, and the traffic that was produced, the Court can only conclude not only that Seres was aware that the LARRY L was embarked on an attempt to interfere with Ta Chi's plan to salve its vessel through a professional salvor, but also that the master of the LARRY L was aware of Ta Chi's plan.

Having dropped the pilot at 1:50 A.M. on November 13, the LARRY L commenced her voyage at 3:00 A.M. Heavy weather and an oncoming storm forced the ship back to shelter around 10:00 A.M., and the voyage was not resumed until 6:13 P.M. on the 13th. From 9:30 P.M. on the 13th until 9:52 P.M. on the 15th the LARRY L was on course of 178° south. For most of this period, she travelled in heavy weather. On November 15, with the weather moderating, she altered course to 158°, on the 16th to 147°–149°, and on the 17th, at 4:00 A.M., to 160°. She stayed on this course until noon of the 17th when she went to 180°. She continued on this course until her chief mate sighted the EURYPYLUS on the horizon at 4:05 P.M. on the 19th. The ship was "a little to the right" of the LARRY L's 180° course. Larry L Exh. 14, at 10.

That the EURYPYLUS lay along the path of the LARRY L was hardly the coincidence her master attempted to portray at

---

**10.** Seres obtained the charters for both the JANICE L and the LARRY L. Since it monitored the positions of the ships it chartered it must have been aware of the positions and destinations of the LARRY L as well as the JANICE L.

trial.[11]  Although the Court does not have copies of the radio traffic of the LARRY L prior to November 18—much of which could have been via radiotelephone—it does have communications commencing on the 18th.  At 2:14 A.M. on that date the LARRY L received an urgent radiogram from Seres reading as follows:

LARRY L. VESSEL HAS NOT SUNK.  POSITION 2038 [Lat. 20° 38 ′ N] 11547 [Long. 115° 47 ′ W].  PASS KEEP OWNERS ADVISED

Larry L Exhs. 13A at 108–109, 17m.

Again, about 24 hours later at 2:10 A.M. on the 19th, the LARRY L received another radiogram from Seres:

URGENT TO THE MASTER OF THE LARRY L.  EURYPYLUS 2038 [Lat. 20° 38 ′] NORTH 11947 [Long. 119° 47 ′] WEST.  GO AND LOOK.  PHONE OR CABLE CONDITION

Larry L Exhs. 13A at 110, 17l.

Finally, on November 19 two further cablegrams were received from Seres at about 7:40 P.M.  These read as follows:

THERE IS NO NEW POSITION.  VESSEL DRIFTING SOUTHWESTERLY.

Larry L Exhs. 13A at 110, 17k.

MOST URGENT.  ANOTHER SOURCE GIVES POSITION 2238 [Lat. 22° 38′] NORTH 11947 [Long. 119° 47′] WEST.  MONDAY EVENING CABLE OFFICE

Larry L Exhs. 13A at 110, 17j.

At the time these last two messages were received the LARRY L was about one-third of a mile from the EURYPYLUS.  The master of the LARRY L responded at 3:32 A.M. on November 20, 1975 as follows:

19193 [November 19, 7:30 P.M.] I found it elsewhere.  I'm next to it four-tenths.  It's even fore and aft.  It's not listing.  Only a little white smoke is coming from the accommodation.  Stop.  Neither fire

nor flash or signs of strong fire.  Its bows heading 150.  Whether [sic] north, northeast 4.  Moderate swell.  I am at a distance from Ambatzi 755 miles.  Stop.  If operation is undertaken St. Lukas will become 20050 on local.  Everything is ready and studied.  Stop.  I'm alone here.  Advise me.

Larry L Exhs. 13 at 60, 18c.

The initial statement about finding "it elsewhere" was in response to the fact that the positions given in prior cablegrams, *supra*, were partially but significantly erroneous.  The EURYPYLUS is not identified nor is its location.  The body of the message itself does not indicate the sender.  When asked about "Ambatzi" the master, Sarris, reluctantly testified that it was the name of a friend of his who lived in Long Beach, California and who was known by those at Seres.  "Ambatzi 755 miles" thus meant the LARRY L was within a radius of 755 miles from Long Beach.  Larry L Exh. 13 at 62.  As for "St. Lukas will become 20050 on local," the master identified St. Lukas as a code name for EURYPYLUS, St. Lukas being the name of "a church in my village in the war years."[12]  Larry L Exh. 13A at 160.  In other words, if the master was given permission by Seres to take the vessel in tow, he could commence the operation at 5:00 A.M. on the 20th.  *Id.* at 182.  When asked whether those at Seres were aware of the meaning of "St. Lukas" the master replied that they were seamen and could understand him and that he did not independently inform them.  He added that "[t]here was also a St. Lukas, a cape in lower California which is called St. Lukas, by coincidence."  *Id.* at 183.[13]

This was no coincidence.  In the early morning of November 21 Seres responded to the coded message from the LARRY L,

---

**11.**  The contention of the master that the LARRY L was following normal ship lanes is not convincing.  He headed east after taking the EURYPYLUS in tow in order to reach the shipping lanes.  Furthermore, continuation of his 180° course would have brought him far west of Balboa.

**12.**  The master was reluctant to testify about St. Lukas or Ambatzi, and protested that "[t]he captain should have little secrets to himself."  Larry L Exh. 13 at 61.

**13.**  San Lucas, or Cape San Lucas, is at the southernmost tip of Baja California South, Mexico.  It lies approximately 100 miles north of Lat. 22°, Long. 110°.

consenting to the boarding and salvage, and directing the LARRY L, if successful, to "proceed towards Luca." Larry L Exhs. 17i, 17o. Therefore, it would appear that St. Lukas was not just a code name for the EURYPYLUS but a possible destination of the tow. In this regard it should be noted that Seres counsel, Livanos, denied ever hearing of either Ambatzi or St. Lukas. T. at 152–153.

In the late evening of November 20, the LARRY L again communicated with Seres. This radiotelegram, Larry L Exh. 20c (translated at Exh. 13 at 62–63), sent at 11:13 P.M., reads as follows:

November 19th 1930 (7:30 P.M.) I found a ship in position 2134 north, 120 25 west with the help of radar. It's without lights, navigational lights and it appears abandoned. I approached it at four-tenths to ascertain if there are any people on board. I remained near it during all the nighttime to render help. Stop. There is no indication that anybody is remaining on it. On first sight it appears that it was abandoned because of fire. Stop. November 20th 0700 a group of my crew with the chief mate in charge on the abandoned ship. Its name EURYPYLUS. Registered Formosa and they ascertained that there is nobody aboard. They're trying to close doors and entrances to hatches to restrict the fires. They tried to find any leaks and stop them. Stop. At 11:00 o'clock three lines, new ones, were given from my ship and they were secured on the foredeck of the abandoned M/V EURYPYLUS. Stop. 1200 hours my group returned on board my ship. I secured my boat and am proceeding towards port of destination Balboa, Panama. Stop. Reverting master.

This is the first mention by the LARRY L in a radiogram of the name EURYPY-LUS, and the first message to give the actual position of the vessel. In view of certain statements made which are not consistent with the developed facts it is clear that this message was obviously for use in a salvage claim.[14] Since the EURYPYLUS was now under tow by the LARRY L, secrecy no longer had its prior importance. Early the following morning the LARRY L sent identical radiograms to the charterer and subcharterer Sovfracht Mosco and Exommsa, Geneva which read as follows:

NOVEMBER NINETEEN 1930 HRS POSITION 2134 NORTH 12025 WEST FOUND DRIFT VESSEL WITHOUT NAVIGATION LIGHTS STOP I PASS FOUR TENCE [sic] OF MILES CLOSE TO THAT VESSEL AND I WATCH WHOLE NIGHT IF ANY SEAMEN OR PASSENGERS BE ON BOARD STOP NOVEMBER TWENTY 0700 GROUP OF MY CREW BOARDED TO THE ABANDONMENT VESSEL NAMED EURYPYLUS PORT OF REGISTRY TAIWAN DAMAGED BY FIRE STOP NOVEMBER TWENTY 1200 HRS COMMENCE TOWING OF S/S EURYPYLUS BY MY VESSEL DESTINATION BALBOA REVERTING

MASTER M/V LARRY L

Larry L Exh. 18e. Both of these messages were sent at approximately 0500 on November 21.

Late in the morning of that day word reached Trans Mar, as agents of Ta Chi, that the LARRY L had placed lines aboard the EURYPYLUS on November 20. Trans Mar immediately filed a complaint and order to show cause seeking immediate and sole control of the vessel. *See Ta Chi Navigation (Panama) Corp. S.A. v. S.S. "LARRY L",* 75 Civ. 5920 (S.D.N.Y., Nov. 21, 1975). A hearing was held at 5:00 P.M. before Judge Duffy of this court. At that time plaintiff's demand for possession and

---

**14.** Contrary to the statement in the radio telegram, no serious attempt was made to close doors and entrances to hatches, to restrict the fires or to find leaks and stop them. Everything in the accommodation house had been burned out by November 11. Janice L Exh. 1 at 50–51. No attempt was made to close valves. Larry L Exh. 14 at 29; Exh. 15 at 53. While some doors were closed, presumably in the midship accommodation house at deck level, some doors were also opened and shut. Larry L Exh. 14 at 22–23. Indeed two hatches were opened and left open. As for the securing of the lines from the LARRY L, they were not new lines.

control was granted on condition that plaintiff post a $100,000 bond to cover possible salvage claims. The defendants were ordered to post a $20,000 bond to cover possible damages due to defendants' actions.

However, before the LARRY L was informed of the court order, the following events transpired. After having received authorization from Seres to attempt to salvage EURYPYLUS, the master of the LARRY L called a meeting of the ship's officers to discuss the proposed operation. At that time it was decided that a motor lifeboat, under command of the chief mate, would be sent over to the EURYPYLUS. Sometime after 5:00 A.M. on the 20th, the lifeboat was launched with five officers and men aboard; the group included the chief mate, the second mate, the third engineer, the bosun and one AB.[15] However, the motor in the lifeboat broke down and it was necessary for the LARRY L to pick the boat up. After the chief engineer had repaired the engine the motor lifeboat again left for the EURYPYLUS, some 600–1200 feet away. By 7:30 A.M., they were all aboard except the chief engineer who remained alongside in the lifeboat. The men boarded the vessel forward of the accommodation house and hatch # 3, under instructions to search for survivors or the dead. The men were instructed not to go aft beyond the forward part of the accommodation house. This search, according to the master, occupied some 2½ hours, and did not terminate until after 10:00 A.M. However, the Court believes that no extended search, if any, took place. The men had brought with them in the lifeboat a coil of heaving line, about 1200 feet long, one end of which they took with them to the EURYPYLUS, the coil running out from the LARRY L. The men on the LARRY L attached a nylon propylene rope which the men on the bow of the EURYPYLUS heaved in and made fast by turns on the bitt. This operation allegedly commenced at 10:10 A.M. and was completed at 11:30 A.M. During this time, three 7-inch or 8-inch ropes were run from the LARRY L to the poop deck of the EURYPYLUS. The boarding crew returned to the LARRY L at 11:50 A.M. Before leaving the vessel, they discharged some 9 or 10 small portable foam fire extinguishers into hold # 3. As the master testified, the boarding crew "had the fire extinguishers *for their own safety*. When they were ready to leave, they emptied the fire extinguishers" into # 3 hold. Larry L Exh. 13 at 54 (emphasis added). Nobody was left aboard the vessel to keep watch or tend the lines, nor were lights placed aboard her. The LARRY L commenced towing the EURYPYLUS at 12:00 noon on November 20. At that time her position was Lat. 21° 25′ N, Long. 120° 29′ W, over 2500 miles from Balboa, Panama, her next port of call and the intended destination of the tow.

On the following day, November 21, a boarding crew returned to the EURYPYLUS at 8:10 A.M.; they were back aboard the LARRY L by 12:20 P.M. During this visit the two lines that were made fast to the starboard side bitt were moved over to the port side where the other line was secured. Two more lines were also added, including an 11-inch line, so that in all there were five tow lines. The crew again took with them ten small fire extinguishers—recharged aboard ship—which they discharged into # 3 hold from the main deck. On the evening of November 21, at 8:55 P.M., the master of the LARRY L received the following message from Seres in New York:

ADDRESS URGENT MASTER M/V LARRY KPH COURT DECIDED RE-

---

**15.** Those constituting the boarding parties on the three occasions when the EURYPYLUS was boarded by the LARRY L's crew were:

| 11/20/75 (Trip 1) | Chief Mate Frangos 3rd Officer Maurelos Chief Engineer Diamantopolos Bos'n Mizan Seaman Papakonstantinos |
|---|---|
| 11/21/75 (Trip 2) | Chief Mate Frangos 3rd Officer Maurelos Chief Engineer Diamantopolos Bos'n Mizan Seaman Victor Hernandez |
| 11/21/75 (Trip 3) | Same as on 11/21/75 (Trip 2) |

LEASE EURYPYLUS TO TUGBOAT SALVAGE CHIEF. CALL LETTERS WKGY. POSITION 28° N 118° W. PROCEED SOUTH CONTACT BY RADIO ARRANGE RENDEZVOUS TRANSFER VESSE[L] TO TUG. RECEIVE LETTER OF SAFE DELIVERY. THE[N] RESUME COURSE TO DESTINATION. CONFIRM AND ADVISE TIME AND POSITION VESSEL DELIVERED. SERSHIPING

Larry L Exhs. 13 at 78, 17e.

On the following morning, November 22, at 10:08 A.M., the LARRY L received the following message from the master of the SALVAGE CHIEF:

IN ORDER TO EXPEDITE RENDEZVOUS PLEASE ADVISE PRESENT POSITION, COURSE AND SPEED. STOP. PLEASE MONITOR CHANNEL 16. REPLY VIA RCA MASTER SALVAGE CHIEF.

Larry L Exhs. 13 at 80, 17g.

This message was received shortly before a boarding party left to board EURYPYLUS. The LARRY L had stopped that morning at 8:00 A.M. when it was discovered that three of the five lines being used to tow the EURYPYLUS had parted. This time, therefore, the boarding party was being sent to repair the three lines. Once the motor lifeboat pulled alongside, the chief engineer, instead of remaining in the boat, boarded the vessel to determine whether the anchor of EURYPYLUS could be freed from the anchor chain so that the chain could be used for towing if the lines parted again. The boarding party returned to the LARRY L at 4:00 P.M. The position of the LARRY L on November 22 was Lat. 21° 37' N, Long. 117° 48' W. During the three days that the LARRY L attempted to tow the EURYPYLUS, the LARRY L had men aboard for a total of 13 hours and 40 minutes. At no time were they aboard at night. Larry L Exh. 15 at 40–42.

On the evening of the 22nd, the LARRY L received a further message from the SALVAGE CHIEF:

WE DO NOT HAVE CW. REQUEST YOU TRANSMIT YOUR CALL LETT ON 410 KILOHERTZ FOR 5 MINUTES ON EACH HOUR COMMENCING AT 1000 GMT NOVEMBER 23RD FOR RDF BEARING. ALSO STAY VHF CHANNEL 16. OUR POSITION 1700 GMT TODAY. 25 DEGREES 23 MINUTES NORTH 118 DEGREES 16 MIN WEST. SPEED 8, 8 KNOTS. ESTIMATE RENDEZVOUS 23RD 0600 LOCAL TIME 1400 GMT. MASTER SALVAGE CHIEF.

Larry L. Exhs. 13 at 81, 17t.

The following morning, November 23, at 10:30 A.M., the LARRY L surrendered the EURYPYLUS to the SALVAGE CHIEF after receiving a receipt from the latter vessel.[16] Her position at that time was Lat. 21° 32' N, Long. 117° 32' W. The LARRY L, having covered 10 miles since the prior day in order to intercept the course of the SALVAGE CHIEF, resumed her voyage and reached Balboa one week later. When the LARRY L surrendered the EURYPYLUS the two ships were *138 miles closer to Panama* than when the EURYPYLUS was taken under tow.

In considering the salvage claim of the LARRY L the Court must, of course, determine whether the three requisite elements, which must be present in every salvage operation, are present in this case. These elements, hereinbefore referred to, are: "[1] marine peril; [2] service voluntarily rendered, not required by duty or contract; and [3] success in whole or in part, with the service rendered having contributed to such success." *B.V. Bureau Wijsmuller v. United States, supra,* 702 F.2d at 338; 3A M. Norris, *supra,* § 15. The salvor has the burden of establishing these three elements. *Lincoln S.S. Line Inc. v. United States,* 7 F.2d 886 (2d Cir.1925); *Nadle v. M/V Tequila, supra,* 377 F.Supp. at 417.

16. With the JANICE L in mind, the master of the LARRY L submitted a form of receipt which recited that the EURYPYLUS had "no any hole around the vessel, to of sea level" and "no any sea water on board." Larry L Exh. 22.

█ Insofar as a "marine peril" is concerned, the salvor need only establish that "at the time the assistance is rendered, the ship has encountered any damage or misfortune which might expose her to destruction if the service were not rendered." 3A M. Norris, *supra,* § 188; *see also Markakis v. S.S. Volendam, supra,* 486 F.Supp. at 1106; *Conolly v. S.S. Karina II, supra,* 302 F.Supp. at 679. In this case, while it is true that the EURYPYLUS had suffered a severe explosion and fire on November 10, 1975, nine days before the LARRY L found her, her condition on November 19 was not as bad as the LARRY L has attempted to portray. Post-trial Brief on Behalf of Claimants, Master and Certain Crew Members of the M.V. LARRY L, at 13. When the master of the LARRY L observed EURYPYLUS, he observed no fires but only a glow and white smoke coming out of # 3 hold. There were no flames over the deck. The following morning he observed the vessel in daylight. She was "approximately on an even keel 23' to 23' 6" draft aft and forward a little bit by the head, not too much. It must have been about 23' 6" to 24', because with the waves I could not tell exactly the draft. She had a little list to port." Larry L Exh. 13 at 48. However, there is no question that, although the vessel had weathered 9 days in the Pacific completely unattended, there was still a fire in # 3 hold and, unknown to the master, in # 4 hold. This in itself was sufficient to constitute a "marine peril." "A non-friendly fire aboard ship so long as it remains unextinguished is a classic case of marine peril." *Legnos v. M/V Olga Jacob,* 498 F.2d 666, 670 (5th Cir.1974) (footnote omitted).

As for the services rendered being voluntary, there is no question about that: they were certainly voluntary.

█ Since the first two elements have been established, the remaining and crucial question is whether the services were successful in whole or in part, or whether the services contributed to subsequent services that were successful.

Captain Joseph Madeo ("Captain Madeo"), the salvage expert called by the LARRY L, was asked for an opinion as to whether the LARRY L performed beneficial salvage services for the vessel EURYPYLUS during November 1975. T. at 250. His answer was as follows:

I believe the LARRY L performed a service that eventually contributed to the ultimate salvage of the vessel by locating it, by standing by it, by reporting it—its presence and location and eventually by towing it, getting control of it, so that it no longer was a derelict and a hazard to the sea, to navigation.

T. at 251.

In more detail, taking these elements of the services rendered one at a time, he thought that

the eventual help that was given to the vessel was given that much sooner by the ship being located and its location being reported. The ship as a derelict was certainly a hazard to navigation. Having a large ship standing by it or eventually towing it not only provided a radar contact for passing traffic but also provided, especially at nighttime, a visual acknowledgment of its presence.

T. at 251.

However, there is no evidence that the LARRY L reported the position of the EURYPYLUS when she first discovered her. Her first message to Seres did not identify either the vessel or its position; the second message gave a position but no identification. It was not until the LARRY L had the EURYPYLUS in tow that she advised Seres of both name and position. The master of the SALVAGE CHIEF, Captain Reino Mattila ("Captain Mattila"), testified that he received no communication from the LARRY L until after she had taken the EURYPYLUS in tow and that this message was received from the Portland office of Devine. The first position the SALVAGE CHIEF received after sailing stated that the EURYPYLUS had been reported as a derelict and was still on fire at Lat. 23° 28' N, Long. 119° 42' W. It was understood that the ship had been abandoned. This

position had been reported by other passing ships. On November 16, the SALVAGE CHIEF received a further position of Lat. 22° 38′ N, Long. 119° 47′ W from the Coast Guard Search & Rescue Unit in Long Beach, California. T. at 170–172.[17] There is no evidence that daily positions were given to the Coast Guard or to other vessels over any emergency or other channel. The LARRY L's salvage expert testified that if that ship had advised the Coast Guard of the proposed towage he presumed that the Coast Guard would have issued a notice to mariners. There is no evidence that any such notice was issued. The LARRY L adopted a policy of silence and coded messages, permitting the EURYPYLUS to remain without lights during the night of November 19 and thereafter. In contrast the JANICE L had notified the Coast Guard as soon as she sighted the burning vessel on the evening of November 10.

It is difficult to see how this secrecy contributed to the ultimate rendezvous. While the LARRY L did move 10 miles to intercept the course of the SALVAGE CHIEF, the expert witness for the LARRY L admitted that the SALVAGE CHIEF, by following standard navigation proceedings, could have found the EURYPYLUS based on the information which it received shortly after leaving Portland, Oregon. T. at 269–270.

Captain Madeo also expanded on the other element of the service rendered by the LARRY L's towage of the EURYPYLUS.

The matter of control, by taking the vessel in tow, she was able to proceed a little closer to the beach. [The LARRY L] certainly had her under control in the event there was some passing traffic that itself was unable to maneuver out of the way. Perhaps a heavy tow like that had very limited maneuverability. The combined maneuverability of the two units could have forestalled an accident.

T. at 251–252.

Assuming that the LARRY L had control of EURYPYLUS, she was certainly capable of maneuvering her out of the path of oncoming vessels except during those periods when she was stopped and engaged in either adding lines or repairing them. However, the ships were not in a harbor or crowded shipping lane. The LARRY L did not report sighting any vessel before the arrival of the SALVAGE CHIEF.

Thus, in light of the above, the Court concludes that none of the actions taken by the crew of the LARRY L while on board the EURYPYLUS or during the tow entitle that vessel to an award of salvage. *See St. Paul II.* The only "service" that the LARRY L may have performed that would entitle her to such an award was the bringing of the EURYPYLUS closer to port.

In *Lambros Seaplane Base v. The Batory,* 215 F.2d 228 (2d Cir.1954) (hereinafter *"The Batory"*), the second circuit considered the duties of the salvor of a derelict in its selection of the port into which it brings the derelict. In that case the derelict was a seaplane but the court considered the principles of maritime law applicable, as it was required to do.

In August 1953, the BATORY, a Polish transatlantic liner with 500 passengers aboard, was proceeding eastward bound for Southhampton, England. While off Fire Island, some 50 miles from New York, it observed a seaplane which circled the liner, landed, and took off again—the pilot shouting that he was lost, out of gas, and without a compass. On directions of the master of the BATORY, the pilot landed again and was taken aboard together with the plane. When asked as to its disposition he replied "to hell with the plane." *Id.* at 230. The plane had been rented from Lambros Seaplane Base in New Jersey. The pilot and plane were transported to England. The owner of the BATORY subsequently refused to return the plane to the United States unless transportation charges were paid. Neither the BATORY nor her owner took any steps to libel the

---

**17.** This is the same position given to the LARRY L by Seres on November 19, 1975, *supra,* Larry L Exh. 17j.

plane for salvage in any British court, and the plane was delivered to the British Receiver of Wrecks for storage. Ultimately the plane was sold at auction for a price insufficient to pay the storage charges. In an action by the plane's owner in this district, the court ruled that the BATORY was "grossly negligent in failing ... to return the plane to shore" and liable in damages. *Id.* at 231. The cross-libel by the BATORY's owner for salvage was dismissed on the merits.

On appeal, the circuit court considered whether the BATORY had forfeited its right to salvage:

> Was right to salvage forfeited by carrying the plane to England instead of leaving it in safety at a nearer American port? In *Western Transportation Co. v. The Great Western*, D.C.N.D.N.Y. 1862, 29 Fed.Cas. page 788, No. 17,443, the governing rule was stated as follows:
>
>> "There is, however, no inflexible rule that salvors must take the property saved to the nearest convenient port, or retain the property for adjudication at the first port at which it arrives in safety. *Post v. Jones*, 19 How. 150 [15 L.Ed. 618]. In all their proceedings, they should act in good faith, and with reasonable skill and judgment; and, while they are entitled to protect their own interests by proper means, they must not forget or disregard the interests of the owners of the property saved."
>
> See also *Hartshorn v. Twenty-Five Cases of Silk*, D.C.S.D.N.Y., 1841, 11 Fed.Cas. page 713, No. 6,168a. Cf. *The Sapinero*, 2 Cir., 5 F.2d 56. We think this principle as sound today as in 1862 when The Great Western was decided, although of course the intervening development of techniques in aid of marine shipping, such principally as wireless communication, may occasionally require a modified application of the principle.

215 F.2d at 234.

Norris has explained this principle as follows:

> It is the salvor's duty to act in good faith in bringing or sending the salved property as promptly as possible, under the circumstances, to a safe place or port where it can be brought under the control of an admiralty court or where it may be in a position to be claimed by the owner. The safe port need not necessarily be the nearest convenient port. Adverse weather conditions, lack of proper charts, etc., may excuse the salvor in not taking the property to a nearby port.
>
> The salvor should not take the salved property to a distant point for the purpose of extending the duration of the salvage operation, to harass the owner of the distressed vessel or cargo or for any other improper or irregular purpose. The salvor is not obliged to take the salved property to the port of destination where there is an intermediate port in the same country to which the vessel might go without substantially interrupting her voyage.
>
> Unless there are special circumstances, the salvors should comply with the request of the owner to bring the salved property into a nearby, safe port.
>
> The burden of proof as to misconduct in taking the property into port is upon the party charging such misconduct.

3A M. Norris § 119, at 8–33 to 8–39 (footnotes omitted).

In reviewing the lower court ruling on the issue of negligence in *The Batory* case, Judge Hincks noted

> that amongst the factors which affect a salvage claim are the values not only of the vessel or property saved but also of the salvor vessel including the obligations under which the salvor vessel operates. Time lost by a transatlantic liner, under obligation to transport some 500 passengers without avoidable delay, would obviously constitute a factor of large dimensions.

215 F.2d at 234 (footnote omitted). The value of the seaplane was $6,200. The value of the BATORY was in excess of 7 million dollars and she was heavily laden with general cargo of undetermined value

in addition to the passengers.[18] Accordingly, the court held that the BATORY had not sacrificed its right to a salvage award by taking the plane to England.

In *The Batory*, of course, the salvage was successful. The seaplane was delivered safely to England where it could have been repossessed by the owner who had been kept informed. In the instant case, the LARRY L was unsuccessful. However, it would be illogical to argue that there can be no charge of negligence against a salvor unless he is successful. Unlike the BATORY, the LARRY L has no estimated time of arrival for Balboa; it depended on the weather and the speed which it maintained. And the comparison of value as between the LARRY L and the EURYPYLUS and cargo was totally unlike the disparity between the BATORY and the seaplane.

Captain Madeo stated that by towing the EURYPYLUS "she was able to proceed a little closer to the beach." When the LARRY L took the EURYPYLUS under tow she was 2,653 miles from Balboa, but only 755 miles from Long Beach. Larry L Exh. 13A at 189. The master of the LARRY L, allegedly seeking more favorable weather and sea conditions and hoping to get closer to the shipping lanes, set a course of 90° which, if continued, would have brought him to the shores of Baja California in Mexico. *Id.* at 188. Had he set a course of 70° he would have reached Long Beach. *Id.* at 169. The LARRY L's salvage expert testified that in a salvage operation time is of the essence. "In the open sea, there is a certain allotted time in which to get the job done, but unfortunately the salvor never knows what that allotted time is, so in off-shore salvage you get the job done just as fast as you can." T. at 252. He also believed it would have been possible for the LARRY L to tow the EURYPYLUS "into any of the southern California ports ... where some tugs could have come out and picked her up," T. at 258, and "that under the circumstances the best thing would have been to get the ship to where adequate fire-fighting facilities were available ...." T. at 277.

However, at the time the SALVAGE CHIEF took over the tow of the EURYPYLUS the LARRY L was headed toward Balboa, some 2,595 miles to the south, while San Diego and Long Beach were some 705 miles and 800 miles respectively to the north. Thus, the LARRY L had towed the EURYPYLUS 58 miles closer to Balboa but 45 miles farther away from Long Beach. The LARRY L's salvage expert, aware that the master of the LARRY L was determined to tow the EURYPYLUS to Panama, believed that before the tow had proceeded much farther the master would have reassessed his position or that "clearer heads on the beach" would have directed him into the nearest port. T. at 261, 271–272. The difficulty with such a prediction is that Seres—"on the beach"—had directed the master on the course he was following. Captain Mattila, who completed the salvage successfully and who testified as the salvage expert for EURYPYLUS and cargo, stated at trial that when he took over the tow, not only #3 hold, but also #4 hold was on fire, that the rudder was jammed 20° to port, that nine feet of water was in the engine room and that water was in #5 hold. T. at 179–180, 189. The LARRY L had no way of extinguishing these fires, had no portable pumps to control the water, and had no means by which to free the jammed rudder. The EURYPYLUS' salvage expert estimated that it would have taken the LARRY L from 66 to 117 days to reach Balboa with EURYPYLUS in tow. T. at 198–200. In his opinion it would have taken "incredible luck" for the LARRY L to have towed the EURYPYLUS to Balboa because he believed the fire would have spread into #1 and #2 holds and that there was a good chance the ship would have sunk from the flooding aft. T. at 206–207. "[The ship] would have lasted

---

**18.** The stipulated value of the LARRY L in November 1975 was $3,735,876. T. at 122. The stipulated value of the JANICE L was $3,780,- 000. T. at 78. For the stipulated value of the EURYPYLUS see note 8 *supra.*

a week. I don't know. It all would have depended on [the weather]." T. at 207.

It is clear to the Court that the LARRY L was guilty of wilful misconduct in attempting to tow the EURYPYLUS to Balboa, Panama. No extenuating circumstances exist in this case to justify the LARRY L's decision to tow the burning EURYPYLUS to a port almost 1,900 miles away from the nearest American port. The master of the LARRY L explained his action as being dictated by his belief that "seamen never go back. We always go ahead." Larry L Exh. 13 at 68. Indeed, it took an order of this Court to turn him back. The Court concludes that the attempt to tow the EURYPYLUS to Balboa in no way contributed to the ultimate salvage of that vessel.

■ Moreover, "[s]alvage must not of course be made merely an opportunity for officious interlopers; a vessel in distress is not to be killed by kindness, particularly that of interested friends." *The William Rockefeller, supra*, 55 F.2d at 905. In addition to raising certain defenses against the recovery of salvage, the shipowner, Ta Chi, charges that the LARRY L was an interloper. This claim is based on the ground that the owner and agent of the LARRY L was advised on November 12, 1975 by Ta Chi that a professional salvor was being retained and that the services of the JANICE L were no longer required. Janice L Exh. 9. Here, there is no question that the master of the LARRY L, despite his testimony to the contrary, knew that the vessel was the EURYPYLUS; that she had been drifting unmanned for at least nine days on the open seas while still retaining her stability; that she was in no immediate danger of sinking; that she had been reported abandoned; and that a contract salvage operation was under way. Indeed, the only emergency that existed at the time the LARRY L came upon the EURYPYLUS was which ship would first take her in tow, the LARRY L or the SALVAGE CHIEF. The Court concludes that the LARRY L was not a salvor but an interloper.[19]

One further charge has been insinuated, if not alleged, by Ta Chi. This is not a comfortable case; not just a tale of competitive salvors. Ta Chi implies that at least one purpose of the attempted salvage by the LARRY L was to loot the EURYPYLUS. This charge is based on a message received by the LARRY L from Seres after the LARRY L had surrendered the EURYPYLUS to the professional salvor. Presumably it is also based on the secrecy attending "operation St. Lucas," both before and after the surrender of the vessel to the professional salvor, and on conditions observed aboard the EURYPYLUS by that salvor.

Among the copies of wireless messages from Seres to the LARRY L, there is an unsigned message to "Captain Georgi" (the master of the LARRY L) advising him that "on arrival Balboa, Markos Livanos will arrive to arrange the reports" and that "if any from your crew took anything from the cargo of St. Lukas ... throw it overboard before arriving Panama." LARRY L Exhs. 13A at 161–162, 17n. Although the message is not dated, it would appear to have been sent after the EURYPYLUS had been turned over the SALVAGE CHIEF. When the professional salvors went aboard EURYPYLUS, they found # 1 and # 2 hatch had been uncovered, the tarpaulin pulled back, and a wooden hatch cover taken off and left open. T. at 180. These were the holds that had escaped any substantial fire damage.

While "St. Lucas" or "Lucas" are allegedly code words for the EURYPYLUS, they were on occasion used by Seres and the LARRY L in connection with the word "operation." What that operation was is partially revealed in the testimony of the master of the LARRY L in connection with

---

**19.** Livanos testified that he had read that Ta Chi had employed a tugboat other than the SALVAGE CHIEF to salve the EURYPYLUS, i.e. the tug ACTIVE which blew up on November 17, 1975. Although he testified he had supporting evidence, i.e. newspaper clippings, no such evidence was ever produced. T. at 144–146.

a message from that ship to Seres at 7:36 P.M. on November 24. The message contains the statement: "[t]hird leg operation St. Lukas terminated." Larry L Exhs. 13A at 198, 20s. The master classified the operation into three parts, i.e., "[1] [t]he operation of boarding and securing, [2] the duration of the towage and [3] the delivery ...." *Id.* at 199. However, he had advised Seres almost 24 hours before sending this message that he had delivered the EURYPYLUS. Why did he have to repeat the fact of delivery if that was, in fact, the third leg of the operation?

■■■■■ The charge of looting, or of an intention to loot, however, cannot be sustained. The master of the LARRY L denies knowledge of any such looting. Moreover, Ta Chi has offered no evidence of missing cargo. Such a charge may not be founded on suspicion, but must be proved beyond a reasonable doubt by those who make it. 3A M. Norris § 101. Accordingly, the Court attaches no weight to this charge in its determination of the salvage rights of the LARRY L.

To summarize, the Court finds that it was the undisputed intent of the LARRY L to tow the EURYPYLUS to Balboa, Panama or, failing such destination, to a Mexican port. There is no question that this has been proved beyond a reasonable doubt. The selection of this port over a closer one was an act of bad faith. Moreover, there is no question that the LARRY L has attempted to portray services in seamanship and effective salvage that are not supported by the evidence. Despite "entries" in the log, when the LARRY L came upon the EURYPYLUS the wind on the Beaufort scale was 4 (approximately 7 mph) and there was a "moderate swell." Larry L Exhs. 13 at 60, 18c. Nine days after the search for the four missing crewmen had been abandoned (on learning that they had been in the engine room), the boarding party from the LARRY L was allegedly still searching for them. The boarding party made no serious efforts to improve the stability or safety of EURYPYLUS. They closed no valves, and while

they closed some doors, they also opened others. The professional salvors found no evidence that the boarding party had done anything to close or affect the ventilators to the #1 and #2 hatches. Indeed, there is little if any evidence that they ever ventured aft of the foredeck. The sole effort of the boarding crew was to rig tow lines, and they did that badly. They did not allow enough length to the tow lines, and they failed to protect those lines from friction so that three of them parted. The weather permitted the LARRY L to come close to the EURYPYLUS and to put men aboard to add lines or repair lines. As a result, no injuries were suffered by the LARRY L, her lifeboat, or any member of the crew. The master conceded that the only damage sustained was to the tow lines which were recovered when the EURYPYLUS was released.

Insofar as the salvage claim of the LARRY L is concerned, it seems clear from the evidence and the reasonable inferences to be drawn therefrom that the LARRY L was embarked on an effort to achieve the salvage which had been denied the JANICE L, that it was aware that the JANICE L had been displaced by a professional salvor, and that it was dispatched in hopes of taking EURYPYLUS in tow, if it were still afloat, before the arrival of the professional or contract salvor.

Accordingly, with all the above in mind, the Court has found that the LARRY L was an interloper. Indeed, even if she were not an interloper, she would not be entitled to a salvage award. The LARRY L was not successful in its attempt at salvage, and did not contribute to the ultimate successful salvage by the SALVAGE CHIEF. Further, the intention of the LARRY L to tow the EURYPYLUS to Balboa, Panama was concurred in by Seres and known to the charterers. Under the circumstances, no salvage may be awarded to the LARRY L, her master and crew, its owner, or charterer.

*Claim of the SALVAGE CHIEF*

Since there is no dispute that Devine, through the SALVAGE CHIEF, performed

fully and with characteristic excellence the services it was contractually obligated to perform,[20] little time need be expended on detail. Devine on November 14, 1975 was alerted by its Portland office that the SALVAGE CHIEF might be employed to search for the EURYPYLUS. It was necessary to take aboard additional fire-fighting equipment and to obtain an extension of certain inspections by the Coast Guard. Early on the morning of November 15, orders were received along with the last reported position of EURYPYLUS: Lat. 23° 28′ N, Long. 119° 42′ W. All stores and crew were aboard by 6:00 P.M. on the 15th but the weather delayed departure until the 16th. On November 17, the SALVAGE CHIEF was advised that the position of the EURYPYLUS on November 16 was Lat. 22° 38′ N, Long. 119° 47′ W. Early on the morning of November 20, the SALVAGE CHIEF put in to Long Beach to pick up additional fire-fighting equipment and personnel. She departed that evening. It was not until November 21 that the SALVAGE CHIEF was advised that the LARRY L had taken the EURYPYLUS in tow and, later that day, that a rendezvous had been arranged. After the rendezvous was effected and the EURYPYLUS taken under tow by the SALVAGE CHIEF, she was brought safely to Long Beach, Los Angeles Harbor on December 2, 1975. Devine Exh. 45; T. at 168–237.

Under the terms of its salvage contract, Devine was to be paid $8,000 per day for running time from Astoria, Oregon to the casualty and, upon completion of salvage services, for running time on the return trip to Astoria. In addition, Devine was to be paid $12,000 per day for working time, i.e., fire fighting and towage, and was to receive 10% of the salved value of the vessel and cargo on the principle of "no pay-no cure." Exh. A to Devine Exh. 41. For the services which it rendered on a daily charge basis, Devine was entitled to $256,000. In addition it was entitled to an additional charge of $15,613.02 for services in maintaining a salvage master and three men aboard from December 7 through December 17, 1975. Finally, under the no pay-no cure provision Devine was entitled to 10% of the salved value of EURYPYLUS (i.e., 10% of $134,132.63, see supra note 8) and of her cargo (i.e., 10% of $1,490,112.32) as delivered by Devine, or a total under the provision of $162,424.49.

Total salvage charges payable to Devine therefore amount to $434,037.51. Of this amount $60,936.52 remains unpaid. Devine Exh. 41. Although there is no dispute as to amount, there is dispute as to the source of payment of this balance due Devine. Devine claims that the balance due should be drawn from funds presently held by this court arising from the sale of a cargo— some 1200 long tons of ferromanganese carried by EURYPYLUS.

On April 14, 1976, Ta Chi filed a claim in intervention upon the ferromanganese in a California action. It filed the claim as owner and charterer of the EURYPYLUS and as trustee and custodian of the general average account. On the same date, Citibank, N.A. ("Citibank") filed a claim upon the ferromanganese as the present owner of said cargo by assignment of the shippers of the goods.

On November 23, 1976 the United States District Court for the Central District of California ordered that defaults be entered as to all persons who did not appear and file claims to or against the proceeds of the ferromanganese ore. The only parties that filed timely claims were petitioner Ta Chi, in its aforesaid capacity; Citibank, as assignee; and El Fortuna Inc., as owner of the LARRY L, et al., salvage claimants.

On November 29, 1976 an order confirming the prior court ordered sale of the ferromanganese for $170,623.07 was signed and filed by the district court. That court ordered the actions transferred to this Court together with the proceeds of sale. The proceeds were ordered to be held for distribution in accordance with any final decree, after appeal, if any, as follows:

20. See Fred Devine d/b/a Fred Devine Diving Co. v. Liberian S.T. Ellen, 1969 A.M.C. 1739, 1740 (S.D.Cal.1966); Fred Devine v. United Transp. Co., 1957 A.M.C. 175 (W.D.Wash.1956).

(a) $103,076.32 with respect to the validity of any general average lien claimed on the ferromanganese in the limitation/exoneration proceeding; and (b) $67,546.75 with respect to the salvage claim by El Fortuna, as owner of the LARRY L, et al. for salvage. Citibank claims that distribution of the proceeds of sale by the district court in California constituted an *in rem* judgment binding on the world. It argues that, since Ta Chi asserted its claim in the California action as trustee of the general average account and not for any specific creditor to that account, Devine may not attack the order of distribution and has no independent standing with regard to that part of the proceeds of sale held by this court solely to satisfy any general average lien in connection with the exoneration/limitation action.

Citibank's position is not well taken. In Ta Chi's intervening complaint in the California action, Ta Chi pleaded that it "solicited the services of a professional salvor to rescue vessel and cargo and to preserve the voyage insofar as was possible." Intervening Complaint of Ta Chi (quoted in Supplemental Reply Memorandum on Behalf of Devine at 2). It further alleged that "the remuneration for the professional salvor and the lien of El Fortuna are each items that are payable from the account established by the General Average Adjuster; plaintiffs herein are trustees and custodians of said account." *Id.*

In clause 9 of the salvage agreement entered into between Ta Chi, as bailee of the cargo, and Devine, specific provision was made that the cargo "will not be released to the owners thereof without obtaining security to cover cargo's obligation for salvage." *See* Agreement for Salvage of the Vessel Eurypylus made as of November 15, 1975, attached to Devine Exh. 41. Citibank has admitted the terms of the contract and that Ta Chi was acting as bailee of the cargo when entering into such agreement. *See* Devine Exhs. 41, 43. Ta Chi and Citibank admit that Devine fully performed the salvage agreement. *See* Devine Exh: 41, Admissions 6, 10–15. Ta Chi and Citibank admit that Devine has not

been paid and is still owed the sum of $60,936.52. *See* Devine Exhs. 41, 42, 43. Indeed, counsel for petitioner, Ta Chi, stated at the commencement of the initial trial, which concerned the exoneration/limitation claims, that Ta Chi's petition for such relief was not made with intent to exonerate Ta Chi's liability with respect to Devine's claim. T. at 3.

In addition to the assertion of the claim by Ta Chi for salvage against the ferromanganese cargo for the benefit of Devine in the California action, cross-claims were made by Devine against the substituted ferromanganese fund and against Citibank. There has been no answer to such cross-claim by Citibank either in personam or as claimant to the ferromanganese fund *in rem*.

Heretofore, Citibank has contested Devine's salvage claim against the ferromanganese fund on the basis of a failure of notification by Ta Chi that it had entered into a salvage agreement with Devine. However, at trial it was shown that notification was sent out to the known cargo interests under date of November 26, 1975. The notice referred to the fire and explosion aboard the vessel and the salvage agreement entered into with Devine. This notification was sent to Almet Inc., the named consignee of the ferromanganese cargo and Citibank's assignor. Devine Exhs. 37–39; T. at 125–129.

■ As has been stated by the court of appeals for this circuit: "It is well settled that a salvor's remedy in personam is not confined to the legal ownership of the property, but extends to one who has a direct pecuniary interest in its preservation." *The G.L. 40*, 66 F.2d 764, 766 (2d Cir.1933). Nor is it necessary that one having such a pecuniary interest be someone who requested the services of the salvor. *See United States v. Cornell Steamboat Co.*, 202 U.S. 184, 194, 26 S.Ct. 648, 651, 50 L.Ed. 987 (1905); *Frankel v. Dravo Corp.*, 479 F.Supp. 55, 56 (D.D.C.1979).

■ A salvage lien is in the highest class of maritime liens. "On public policy

and in the interest of saving imperiled life and property at sea the salvage lien is to all practical purposes, pre-eminent." 3A M. Norris § 147, at 10–13. It has priority over all other maritime liens except those for wages. *Rainbow Line, Inc. v. M/V Tequila,* 341 F.Supp. 459, 464 (S.D.N.Y.1972), *aff'd,* 480 F.2d 1024 (2d Cir.1973). Moreover, "salvage claims among themselves rank in inverse order, the most recent having priority." Gilmore & Black, *supra,* § 9–61, at 739. Thus Devine's salvage claim takes precedence over any salvage claims for services rendered prior to those rendered by Devine. Finally, as above noted, Devine's lien is superior to personal injury claims, and cargo claims.

▆ The validity of Devine's claim against Ta Chi is admitted. The fact that Citibank may have a valid cause of action against Ta Chi for damages, including salvage charges it is required to pay, has no bearing on Citibank's obligation to pay those salvage charges to Devine in the first instance. Indeed, to allow Citibank to escape its obligation to Devine would place it in a position of preference vis-a-vis the other cargo claimants in this action who have responded to salvage charges and who have asserted those charges as items of damage against Ta Chi.

The statement of adjustment by the Average Adjuster was made on April 4, 1977. *See* Claimant Rohm & Haas, Exh. 40; T. at 124–129. At that time, the other cargo interests who are parties to this proceeding responded for their share of general average charges and expenses, including salvor's charges. *See* Devine Exh. 37. Devine has been out of pocket the balance still owed to it since that time and is entitled to interest thereon at 10% from December 7, 1975.

Among the cases consolidated for all purposes by this Court by order filed May 11, 1978 was *Ta Chi Navigation (Panama) Corp., S.A. v. S.S. "LARRY L",* No. 75 Civ. 5920 (CHT). This case was brought by Ta Chi to regain possession of the EURYPYLUS from the LARRY L and to that

extent has been mooted by recovery of such possession. Ta Chi also sought the "right to recover for any and all damages caused by defendants as a result of their unlawful possession of said vessel." *Id.* at 3. Ta Chi does not appear to have pursued the claim for damages either at trial or in post-trial papers, and it will be deemed abandoned.

El Fortuna counterclaimed for salvage in its answer to Ta Chi's complaint. Such counterclaim is dismissed on the merits, with costs to plaintiff.

### CONCLUSION

Four actions arising out of the EURYPYLUS disaster were consolidated for all purposes on May 10, 1978. The actions consolidated were: *Complaint of Ta Chi Navigation (Panama) Corp.,* 75 Civ. 5994 (CHT); *Carolina Floral Import, Inc. v. M.V. "EURYPYLUS",* 75 Civ. 5768 (CHT); *Ta Chi Navigation (Panama) Corp., S.A. v. S.S. "LARRY L",* 75 Civ. 5920 (CHT); and *El Fortuna Inc. v. Certain Cargoes of the Vessel "EURYPYLUS",* 77 Civ. 380 (CHT).

Because the Court has held that the LARRY L is not entitled to a salvage award and because Ta Chi has not pursued its counterclaims against the LARRY L, the two actions that deal with these claims only—*Ta Chi Navigation (Panama) Corp. v. S.S. "LARRY L",* and *El Fortuna Inc. v. Certain Cargoes of the Vessel "EURYPYLUS",* will be deconsolidated, and dismissed. Accordingly, the parties to those actions are ordered to submit proposed final judgments to the Court for approval. The judgment in relation to the action encaptioned *Ta Chi Navigation (Panama) Corp. v. S.S. "LARRY L"* should provide for the return of the funds that were deposited with the Court.

With respect to the salvage claims, the Court has determined (1) that the JANICE L is entitled to $32,870.17, plus interest, for its salvage efforts, of which amount $20,-568.93 [21] is for the account of the charter-

---

**21.** The $20,568.93 figure is based on the amount

awarded to the charterer for deviation expenses,

ers; (2) that Devine is entitled to $60,-936.52, plus interest; (3) that Devine has priority over all other liens and may draw on that money deposited with the Court that derives from the sale of the metal ore returned to cargo interests; and (4) that the LARRY L is not entitled to an award for its purported salvage efforts.

Accordingly, within 10 days from the date of filing of this Opinion, the parties are instructed to submit proposed judgments in each action that specify the damages due each party and the priority, if any, that should be given to each claim.

So ordered.

*see supra* note 7, and the amount awarded to the charterer for communication services provided by the JANICE L. *See supra* discussion at 26. The figure is calculated as follows:

| | |
|---|---|
| $ 1,000.00 | (communication services) |
| 19,158.68 | (time lost) |
| 410.25 | (crew O/time) |
| $20,568.93 | |